**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **NORMAN E. LACEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO: 3:06-CV-1145-MEF** |
| | ) | |
| **CITY OF AUBURN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANT</u>**

COMES NOW Defendant in the above-styled cause, and pursuant to *Federal Rule of Civil Procedure* 56, moves this Court to grant summary judgment in favor of Defendant in that there is no genuine issue of material fact to be submitted to a jury and judgment should be entered in its favor as a matter of law as to all Plaintiff's claims. In support of this motion, the Defendant relies upon the following:

    1.    All pleadings filed in this matter.

    2.    Exhibits A through K, attached hereto[1]

        Exhibit A -    Deposition of Norman Lacey

        Exhibit B -    Affidavit of Steve Reeves with Exhibit B-1

        Exhibit C-    Affidavit of Scott Cummings with Exhibit C-1

        Exhibit D-    Affidavit of Eric Carson

        Exhibit E-    Affidavit of Mikel Thompson

        Exhibit F-    Affidavit of Charles Howard

        Exhibit G -    Affidavit of Jill Holland

---

[1] Although specific page/line or paragraph cites are made to all factual statements made in the memorandum brief, Defendant relies on the deposition and affidavits referenced in their entirety and reserve the right to further cite to the deposition or affidavits relied upon, if necessary, when replying to any response Plaintiff might file to this motion.

Exhibit H-    Affidavit of Kathy Bullard

Exhibit I-    Affidavit of Derek Godfrey

Exhibit J-    Hildreth Driver's License

Exhibit K-    Hildreth Application for Water Distribution Manager

3.    Memorandum Brief, submitted contemporaneously herewith.

WHEREFORE PREMISES CONSIDERED, the Defendant requests summary judgment be granted in its favor and all Plaintiff's claims dismissed as a matter of law.

Respectfully submitted this the 14th day of December 2007.

City of Auburn, Defendant

By: /s/ Randall Morgan
Randall Morgan [MORG8350]
Attorney for Defendant City of Auburn

OF COUNSEL:
Hill, Hill, Carter, Franco,
  Cole & Black, P.C.
425 South Perry Street
Montgomery, Alabama 36104
334-834-7600
334-263-5969 - Fax

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 14th day of December, 2007, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following via email:

Roderick E. Cooks, Esq.
Winston Cooks, LLC
The Penick Building
319 17th Street North
Birmingham, Alabama 35203

/s/ Randall Morgan
OF COUNSEL

# EXHIBIT "A"

## DEPOSITION OF NORMAN LACEY

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE MIDDLE DISTRICT OF ALABAMA

 3                EASTERN DIVISION

 4

 5    CIVIL ACTION NUMBER

 6    3:06-CV-1145-MEF

 7

 8    NORMAN E. LACEY,

 9         Plaintiff(s),

10    vs.

11    CITY OF AUBURN,

12         Defendant(s).

13

14

15

16         DEPOSITION TESTIMONY OF:

17              NORMAN E. LACEY

18

19

20    July 26, 2007

21    10 AM

22

23    SELAH M. DRYER, CSR
```

EXHIBIT
A


COPY

1    EXAMINATION BY MR. MORGAN:

2          Q.      State your name, please.

3          A.      Norman Lacey.

4          Q.      Mr. Lacey, what is your date of

5    birth?

6          A.      August 10th, 1948.

7          Q.      What is your Social Security

8    Number?

9          A.      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.

10         Q.      Do you have a valid Alabama

11   driver's license?

12         A.      Yes, sir I do.

13         Q.      What is that number?

14         A.      I can look it up.

15         Q.      Sure.

16         A.      2537095.

17         Q.      Has your driver's license ever

18   been suspended or revoked for any reason?

19         A.      No, sir.

20         Q.      Have you held a driver's license

21   in any other states besides Alabama?

22         A.      No, sir.

23         Q.      Are you from Alabama?

```
 1          A.      Vigor High School in Prichard.

 2          Q.      Do you have any education above

 3   high school?

 4          A.      Yes, sir.

 5          Q.      Where is that from, Faulkner?

 6          A.      Yes, sir.

 7          Q.      Is that a two-year school?

 8          A.      Yes, sir.

 9          Q.      Do you have a degree or

10   certificate from there?

11          A.      A degree, yes, sir.

12          Q.      What's it in?

13          A.      Water and waste water management.

14          Q.      When did you receive that?

15          A.      I believe it was 1990 -- may have

16   been '89.

17          Q.      So you graduated from high school,

18   worked, and then went back to Faulkner?

19          A.      That's correct.

20          Q.      Do you have any formal education

21   beyond Faulkner?

22          A.      I have attended some college

23   classes -- I don't have a college degree.
```

```
 1          Q.     What college classes:  Where?
 2          A.     University of South Alabama.
 3          Q.     Were you formally enrolled?
 4          A.     Yes, sir.
 5          Q.     What years were you at South
 6   Alabama?
 7          A.     '73 to '75 I think.
 8          Q.     What was your course of study?
 9          A.     Civil engineer.
10          Q.     And I think you hold several
11   certificates?
12          A.     Yes, sir.
13          Q.     What certificates do you hold?
14          A.     I hold a certificate in water
15   treatment, highest available.  Waste water
16   treatment, highest available -- and a master
17   plumber's license.
18          Q.     When did you get the -- is it
19   called a grade four waters operators
20   certificate?
21          A.     I believe.
22          Q.     When did you receive it?
23          A.     1991, I think.
```

1   you volunteer for Iraq?

2          A.     I was assigned.

3          Q.     So when you were hired on they

4   could assign you where you were needed, but you

5   knew it would be in the middle east?

6          A.     That's correct.

7          Q.     I took your application and I made

8   a list of the places that you listed that you

9   had worked, and I want to go through them with

10  you and ask you some specifics about them.  The

11  first place that you have listed was Mobile

12  Water System where you were an operator.

13         A.     That's correct.

14         Q.     Approximately what years was that?

15         A.     1970 to 1973 or '74 I believe,

16  sir.

17         Q.     And you were an operator there?

18         A.     Yes, sir.

19         Q.     Was there any similarity between

20  that job with the Mobile Water System and your

21  position with the Auburn Water Board?

22         A.     They were both water-related jobs.

23         Q.     Did you have any supervisory

1    authority at the Mobile Water System?

2         A.    I supervised only my shift.

3         Q.    How many would have been on your

4    shift?

5         A.    Just one other man.

6         Q.    What would that person's position

7    have been that you supervised?

8         A.    He would have been an operator's

9    assistant or an operator himself, trainee

10   possibly -- they are different people from time

11   to time.

12        Q.    Would that be somebody that's

13   permanently assigned to your shift, or if

14   somebody needed training they may work with you

15   on job training for a period of time and then

16   move on to something else?

17        A.    That's possible.

18        Q.    Did you generally work that shift

19   by yourself as an operator?

20        A.    No, sir.

21        Q.    You almost always had somebody

22   with you?

23        A.    Yes, sir.

```
 1        Q.    And then your next position was

 2   with the, according to this -- and you correct

 3   me if I'm wrong -- the City of Saraland.

 4        A.    I believe I worked for the City of

 5   Prichard before that.

 6        Q.    Okay.  What did you do for the

 7   City of Prichard?

 8        A.    Shift operator.

 9        Q.    Is that similar to what you did at

10   Mobile?

11        A.    Yes, sir.

12        Q.    Any significant difference in the

13   responsibilities?

14        A.    No, sir.

15        Q.    What years were you at Prichard?

16        A.    1974 to 1975, I believe and maybe

17   '76, I'm not sure.

18        Q.    Did you supervise anybody at

19   Prichard?

20        A.    No, sir.

21        Q.    Did you have any budget

22   responsibilities at Prichard?

23        A.    No, sir.
```

1    Q.    Did you have any administrative
2  responsibilities at Prichard?
3    A.    No, sir.
4    Q.    Were you in charge of the
5  scheduling at Prichard?
6    A.    No, sir.
7    Q.    And I assume you didn't have any
8  authority to discipline employees?
9    A.    No, sir.
10    Q.    Why did you leave Prichard?
11    A.    Got an offer in Saraland.
12    Q.    How large a system was the Mobile
13  Water System in '70 and '74 compared to the
14  Auburn Water Board System when you worked at
15  Auburn?
16    A.    I believe the Mobile Water Service
17  water was probably making about thirty million
18  gallons a day.  I think when I left Auburn it
19  was problem making eight, average.
20    Q.    Eight?
21    A.    Six to eight.
22    Q.    How many employees total would
23  there have been in Mobile?

1    Mobile County Water, did they fall under a

2    personnel plan or policy where they were

3    entitled to a due process hearing similar to a

4    city?

5         A.    They were entitled to due process.

6         Q.    Did the Mobile County, Sewer and

7    Fire, did you rely on the Mobile City personnel

8    or Mobile County personnel?

9         A.    No, sir.

10        Q.    You had your own personnel system

11   there?

12        A.    Essentially, correct.

13        Q.    Was there an HR department or

14   personnel department?

15        A.    I actually was most of the HR --

16   me along with an office employee.

17        Q.    My notes say that you left there

18   because you had a nonwork-related injury?

19        A.    That's correct.

20        Q.    What happened with that?

21        A.    Well, I had some problems with one

22   of my feet and I had to have surgery and ended

23   up being unable to walk for an extended period

1   of time.

2       Q.      Did they ask you to resign, or did

3   you voluntarily resign?

4       A.      I voluntarily resigned.

5       Q.      Then the next place that I have

6   that you worked was the City of Jackson.

7       A.      That's correct.

8       Q.      How long were you unemployed

9   between leaving Mobile County Water, Sewer and

10  Fire and going with the City of Jackson?

11      A.      About eight months as I recall.

12      Q.      Did you get unemployment

13  compensation?

14      A.      No, sir.

15      Q.      Did you even apply for it?

16      A.      No, sir.

17      Q.      And your position with the City of

18  Jackson was plant superintendent?

19      A.      Yes, sir.

20      Q.      And that was, I guess, directly --

21  you were an employee of the City of Jackson?

22      A.      That's correct.

23      Q.      Did it have a separate water

```
 1          Q.     Do you have any reason to think it
 2    came just to you, or did it go to all
 3    applicants?
 4          A.     I assume it went to all
 5    applicants -- I don't know.
 6          Q.     You didn't ask for it?
 7          A.     No, sir.
 8          Q.     It just came telling you there had
 9    been a pay scale reduction?
10          A.     That's correct.
11          Q.     Did it tell you the reason for the
12    pay scale reduction?
13          A.     I don't recall.
14          Q.     Any other statements that you are
15    aware of?
16          A.     No, sir.
17          Q.     And you don't have any statements
18    of Rick McCarty taped, written, recorded without
19    his permission?
20          A.     No.
21          Q.     Just to be clear, my understanding
22    is that you were hired as a water plant operator
23    by the water board?
```

1          A.      That's correct.

2          Q.      And your employer was the water

3 board?

4                  MR. COOKS:   Object to the

5 form.   You can answer.

6          A.      Yes.

7          Q.      (Mr. Morgan)   How did you find

8 out, or what caused you to make application for

9 the Auburn Water Board?

10         A.      Alabama State Employment.

11         Q.      They would give you -- I guess you

12 were receiving unemployment compensation?

13         A.      That's right.

14         Q.      And they would give you a list of

15 possible job openings in your area of expertise?

16         A.      That's correct.

17         Q.      Did you apply anywhere else other

18 than the Auburn Water Board?

19         A.      I applied some other places, I

20 don't recall specifically -- there is one in

21 Elmore County -- I don't know.

22         Q.      Was it a water board position as

23 well?

```
 1    hourly salary was.
 2         A.    He told me.
 3         Q.    And that's what you were making as
 4    the chief operator?
 5         A.    That's what I was making as a
 6    shift operator.  Allen replaced me as a shift
 7    operator.
 8         Q.    Is a shift operator the same as a
 9    water operator?
10         A.    Yes, sir.
11         Q.    Water plant operator?
12         A.    Yes, sir.
13         Q.    And you got promoted?
14         A.    Yes, sir.
15         Q.    And you went to chief operator?
16         A.    That's correct.
17         Q.    How much were you making as chief
18    operator?
19         A.    I believe it was about sixteen
20    dollars an hour.
21         Q.    Is that what you were making when
22    you left the employment of the board?
23         A.    I know it was between sixteen and
```

1    seventeen dollars an hour when I left -- I don't

2    recall exactly.

3        Q.    And you were hired in August of

4    '99?

5        A.    That's correct.

6        Q.    And Allen was hired sometime in

7    '06?

8        A.    That's correct.

9        Q.    So on the second meeting with Rick

10   and Tony is when you were made a job offer at

11   ten dollars an hour?

12       A.    Correct.

13       Q.    And did you accept that?

14       A.    Yes, I did.

15       Q.    What other benefits did you have

16   other than the ten-dollars-an-hour salary?

17       A.    Of course the State Retirement

18   Program, which I had to contribute to and health

19   insurance.

20       Q.    Did you have to pay for your

21   health insurance?

22       A.    Yes, sir.  I had to pay a small

23   amount.  It was fairly inexpensive.

1       Q.      So retirement and medical

2   insurance?

3       A.      That's correct.

4       Q.      And then you began your job as a

5   water plant operator?

6       A.      That's correct.

7       Q.      Which I think you held that

8   position until early December of '05 when you

9   became chief operator?

10      A.      Okay.

11      Q.      Does that sound about right?

12      A.      I think so.

13      Q.      So you would have been almost

14  eight days shy, if my math is right, of being 51

15  when you were hired by the City, right at 51

16  when you were hired by the City?

17      A.      Right.

18      Q.      What were your duties and

19  responsibilities as a water plant operator?

20      A.      Well, to produce water for the

21  City, operate the pumps, chemical feeders, make

22  sure the process is working correctly.

23      Q.      Do you do any sampling as a water

1     A.     That's right.

2     Q.     Was anybody else that you were

3  working with you named Martin, Steve did they

4  have a plumber's license?

5     A.     No, sir.

6     Q.     Just generally, tell me what you

7  do, or what you did as a water plant operator.

8  Take me through a day.  Tell me generally what

9  you would do during a day.

10    A.     Well, I would go in and check the

11  levels, the tank levels and I would turn on the

12  remote, the gauges we have, decide how many

13  pumps to run, how much chemicals to feed, look

14  at the filters to see which filters needed to be

15  back washed, make sure all of the chemical tanks

16  were full -- that's basically it.  Check it

17  every hour as we went along during the day and

18  make whatever adjustments were necessary to

19  increase or decrease the flow.

20    Q.     Who was your supervisor?  Who did

21  you report to?

22    A.     Rick McCarty.

23    Q.     Did you supervise anybody?

1        A.        No, sir.

2        Q.        Did you have any contact with the

3   public?

4        A.        No, sir, rarely.

5        Q.        Were you responsible for any

6   administrative functions as a water plant

7   operator?

8        A.        Only for tourists or either

9   students or regulatory agencies.

10        Q.        I guess Rick would be the person

11   who was actually responsible for the paperwork

12   being submitted to the state or whoever?

13        A.        Each operator did paperwork on his

14   own shift -- he had to do his paperwork.  And

15   the man at the end of the day did the paperwork

16   for everybody of the day.

17        Q.        The last shift?

18        A.        That's correct.

19        Q.        And then it would go to Rick?

20        A.        That's correct.

21        Q.        And are those kept on file in case

22   the city or state wants to come by and make an

23   inspection, or is there a report generated from

1   that?

2       A.    It's -- the information is entered

3   directly on the report.  And while I was there I

4   kept copies, I don't know what Rick does with

5   them.

6       Q.    You didn't have any budget

7   responsibilities, did you?

8       A.    No, sir.

9       Q.    And you were not responsible for

10   scheduling?

11       A.    No, sir.

12       Q.    And didn't have any areas -- no

13   disciplinary action -- you didn't take any

14   disciplinary action over employees?

15       A.    No, sir.

16       Q.    Do you move up from water plant

17   operator?  Like sometimes you will be a one or a

18   two, or every six months or a year you get a

19   merit raise or cost-of-living raise, did you get

20   various raises during the time you were a water

21   plant operator?

22       A.    I did get raises during that

23   period of time whenever there was a blanket

```
1          A.      That's correct.

2          Q.      And what would the other two be?

3          A.      Maintenance personnel.

4          Q.      Did the shifts rotate?  Did one

5    person work only at night and one person during

6    the day, or did your shifts rotate?

7          A.      They rotated.

8          Q.      And then in December of '05,

9    according to my records, you were promoted to

10   chief operator?

11         A.      That's correct.

12         Q.      What did you do to be promoted?

13         A.      I applied for the position and I

14   was the only one to apply for the position, is

15   my understanding.

16         Q.      And that was to chief operator?

17         A.      That's correct.

18         Q.      Now was that advertised as an

19   in-house promotion, or did they solicit

20   applications from outside of the water board?

21         A.      My understanding was that it was

22   in-house.

23         Q.      So any water plant operator could
```

1    have applied for that position?

2         A.    That's correct.

3         Q.    And that would have included Steve

4    and Martin at the time?

5         A.    That's correct.

6         Q.    Any others?

7         A.    Terry Coats.

8         Q.    Did you have to take a test or

9    anything, or did you just make an application?

10        A.    I did an interview.

11        Q.    Who was your interview with?

12        A.    With Rick, Tony, and Eric again --

13   same three people.

14        Q.    Was Scott involved with the water

15   board at that time?

16        A.    I think he may have been, but I

17   didn't know him.

18        Q.    I'm assuming that Rick reported

19   administratively to Tony?

20        A.    That's correct.

21        Q.    Who did Tony report to?

22        A.    To whoever was the

23   superintendent.

1        Q.      What did he tell you?

2        A.      Just congratulations -- you are

3    the new chief operator beginning some date --

4    gave me the date.

5        Q.      And I assume that was an increase

6    in pay?

7        A.      Yes, sir, it was an increase in

8    pay.

9        Q.      What about duties and

10   responsibilities?  What's the significance

11   between what you were doing as a water plant

12   operator and what you now did as a chief

13   operator?

14       A.      I had duties also outside of the

15   fence, outside of the wall -- more than just the

16   plant themselves.

17       Q.      What duties did you have outside?

18       A.      Distribution, system sampling, the

19   raw water pumping station.

20       Q.      What would you do there?

21       A.      More or less check it.

22       Q.      And then you would do sampling

23   outside?

1    A.    Yes, sir.

2    Q.    Would your principal place of

3 business still be the water plant and if you

4 needed to you would travel to these other

5 places?

6    A.    Yes, sir.

7    Q.    How about your work days, did it

8 change the hours?

9    A.    It changed for the most part so

10 that I was only working five days a week, eight

11 hours a day except when I had to fill in for any

12 operator that took off, which was fairly

13 frequently.

14    Q.    Well, let's say you were not

15 filling in and you had a five-day, eight-hour

16 work day, what were your hours?

17    A.    Well, they were somewhat

18 flexible.  Generally from six in the morning

19 until four in the afternoon, but sometimes I had

20 to go in later and work late.

21    Q.    I assume if you filled in you fell

22 in the same rotation as the person whose place

23 you took?

```
 1          A.      That's correct.
 2          Q.      And did the same responsibilities
 3   that you had as a water plant operator?
 4          A.      That's correct.
 5          Q.      But as the chief operator you had
 6   responsibilities outside the facility?
 7          A.      That's correct.
 8          Q.      Were there any changes in the
 9   responsibilities that you had inside the
10   facility as a chief operator?
11          A.      I did maintenance work when I
12   wasn't filling in or working outside the
13   facility.
14          Q.      And you reported to who
15   administratively?
16          A.      Rick.
17          Q.      So you would have been 57 then
18   when you were promoted to the chief operator?
19          A.      I believe that's correct.
20          Q.      Did you have any supervisory
21   responsibility as the chief operator?
22          A.      No, sir.
23          Q.      Did you have any contact with the
```

1    public?

2         A.    Yes, sir.

3         Q.    What contact did you have with the

4    public?

5         A.    Sampling at homes and businesses

6    around the community, and discussing water

7    problems, water issues that customers might be

8    having.

9         Q.    Did you have any responsibilities

10   in terms of disciplinary action with other

11   employees?

12        A.    No, sir.

13        Q.    Did you have any administrative

14   duties?

15        A.    Just filing the reports.

16        Q.    Did you have any budgetary

17   responsibilities?

18        A.    No, sir.

19        Q.    Were you responsible for any

20   anybody's work schedule?

21        A.    No, sir.

22        Q.    Going back to the contact with the

23   public, how would you be advised or learn that

1    there was a complaint or a sampling that needed

2    to be done?

3         A.    Get it from a telephone call that

4    was routed to the facility, or directly if

5    someone called the facility occasionally by

6    Mr. McCarty.

7         Q.    Explain to me why you would go out

8    and take a sample from somebody's home.  They

9    were making a complaint about a water issue?

10        A.    It's required.  The State requires

11   that a given number of distribution system

12   samples are collected every month, more or less

13   at random.

14        Q.    So by State requirement you would

15   go out and sample a certain number of homes each

16   year?

17        A.    Correct.

18        Q.    I'm sorry, each month?

19        A.    Each month.

20        Q.    And did you deal with the person

21   or would you take the water sample -- where

22   would you got the water sample from?

23        A.    Well, I would get it at the most

```
1    taste and odor complaints?
2         A.    Well they never use water from a
3    particular faucet, and all of a sudden they
4    start using that faucet the water is going to be
5    stale.  Some hot water heaters will generate
6    hydrogen sulfide as they are heating the water,
7    and we'll get other problems from hot water and
8    not from cold water.
9         Q.    And how about discoloration?
10        A.    May have, it's a possibility,
11   discoloration.
12        Q.    Just sitting up in there for a
13   while?
14        A.    That's correct.
15        Q.    And so your best estimate is that
16   you may have handled a handful of those kind of
17   complaints outside of the office where you dealt
18   with the public?
19        A.    During the period I was chief
20   operator, yes.
21        Q.    Any other reason or occasion where
22   you would deal with the public or a customer,
23   other than the ones we've just talked about?
```

1    A.    No, sir, not unless it's just a
2    casual contact and somebody asked me a question
3    about their water.
4    Q.    How did you learn about the
5    opening or vacancy to the water distribution
6    manager position?
7    A.    I came in one morning and was told
8    that Tony had resigned, was going to another
9    job.
10   Q.    Where did he go?
11   A.    I believe he went to -- whatever
12   it is over in Valley, Alabama.  It's a water
13   authority -- I don't know the name.
14   Q.    Did you know he was leaving before
15   he resigned?
16   A.    I was told about a week before he
17   resigned that he was going to resign.
18   Q.    Did he tell you that or you just
19   heard that scuttlebutt?
20   A.    Rick McCarty told me that.
21   Q.    What was the reason that you were
22   told Tony left?
23   A.    More money.

1      Q.    And then you testified earlier you

2  received an e-mail from Nell about the change in

3  the salary.

4      A.    That's correct.

5      Q.    Was that part of this delay and

6  change in the job description?

7      A.    I only know that there was a

8  delay.

9      Q.    Was it during this delay period

10  that you received a change about the salary?

11      A.    It may have been, I'm not certain.

12      Q.    Tell me what Tony did when he held

13  the position of distribution manager.  What did

14  he do?  What were his day-to-day activities?

15      A.    I don't know his day-to-day

16  activities because he worked at one office and I

17  was working at the water plant.

18      Q.    He was not at the plant?

19      A.    Rarely at the plant.  He made an

20  occasional visit maybe four or five times in the

21  period that I worked there.

22      Q.    In the, what, over six years that

23  you were there?

1    A.    Yes, sir.

2    Q.    Is it fair to say that you did not

3  have frequent interaction with Tony?

4    A.    Rarely.  My interaction was mostly

5  limited to him calling and saying the water is

6  going to be off, or you need to make more water,

7  or whatever because we are doing something.

8    Q.    So you cannot really describe what

9  his day-to-day responsibilities would have been?

10   A.    I can't tell you what his day was

11  like.  I do know what it takes to manage a water

12  distribution system.

13   Q.    Tell me when there was a delay in

14  the promotion process, and they took out the

15  water plant part as you understand it of what

16  Tony did, I guess Rick McCarty continued to

17  handle the water plant part?

18   A.    That's correct.

19   Q.    What was the other part that was

20  left that Tony did that would have been the

21  subject of the promotion to water distribution?

22  What else did he do?

23   A.    Well, that would be the actual

1    day-to-day operation and maintenance of the

2    distribution system, including water line

3    repairs, extensions, meter readings, and

4    whatever other maintenance cleaning lines or

5    fire hydrants that needed to be done.

6         Q.    As I understand your answer, you

7    don't know specifically what Tony did in terms

8    of those responsibilities?

9         A.    No, sir, I don't know what he did.

10        Q.    Going back to your certifications,

11   do you know whether or not to do those other

12   functions that became the subject of the

13   promotion, not the water plant but the other

14   areas, did you need a grade -- would a person

15   need a grade-four water operator's certificate

16   to do those, or do you know?

17        A.    No, sir.  They would not need a

18   grade-four level -- they would need a

19   certificate.

20        Q.    And you wouldn't need a waste

21   water operator's certificate to do those?

22        A.    You wouldn't need it if you were

23   restricted to the water distribution system.  My

```
 1                  (Lunch break.)

 2                    1:14 PM

 3        Q.     (Mr. Morgan)   You had printed off

 4   the application for the position off the web

 5   site and filled it out, and then delivered it

 6   that day?

 7        A.     Yes, sir, along with my resume.

 8        Q.     And then there was a delay, which

 9   apparently was a result of, I'm going to say,

10   dividing up not necessarily but changing some of

11   the responsibilities that Tony may have had --

12   taking those sort of backing them out and I

13   guess Rick was going to do part of it -- and

14   that left open the distribution part that

15   remained as part of the promotion procedure as

16   you understood it.  Is that true?

17        A.     I believe that's true.  As far as

18   I know, that's true.

19        Q.     And then you received information

20   about a decrease in the proposed salary, I

21   guess?

22        A.     Yes, sir.

23        Q.     And then what's the next thing
```

```
 1    that happened in terms of the promotion

 2    procedure?

 3         A.    Well, I had gallbladder problems

 4    and had some time off and had gallbladder

 5    surgery.  During that time I had received a

 6    notification that my application had been

 7    received by the City of Auburn.  I then got a

 8    telephone call asking me to report for an

 9    interview, and I reported for the interview the

10    very day I returned to work after my surgery.

11         Q.    And that was in April that you had

12    the interview?

13         A.    I believe that's correct.

14         Q.    Do you remember what day in April?

15         A.    I don't recall.

16         Q.    I guess when the telephone call

17    that you had received informing you about the

18    interview that you were off work?

19         A.    Yes, sir, I was at home.

20         Q.    And that would have been, I guess,

21    sometime in March?

22         A.    Yes, sir.

23         Q.    Well, did that create any problem
```

1    for you being interviewed the day that you came

2    back?

3         A.    Well, I don't think it necessarily

4    created a problem for me.  I wasn't my hundred

5    percent self, but other than that...

6         Q.    Well, did you ask them to ask

7    anybody to reschedule you?

8         A.    No, sir, I didn't.

9         Q.    Did you verbalize to anybody that

10   was on the interview committee that you were

11   just returning for the first day?

12        A.    Yeah, I started saying that and

13   Scott shook his head no, so I wasn't supposed to

14   say that, so I didn't -- I stopped.

15        Q.    What did you start to say?

16        A.    I said this is my first day back

17   at work I just had gallbladder surgery -- and

18   then he cut me off, so I stopped.

19        Q.    Well, what did he do to cut you

20   off?

21        A.    Just no, like, you're not supposed

22   to say that.

23        Q.    Did he say no?

1       A.      Right.

2       Q.      Did you stay in the hospital any

3   overnight or was it outpatient?

4       A.      It was outpatient, but I had to

5   return that night.  I had the surgery in the

6   morning, was sent home and then I had to return

7   that night.

8       Q.      Do you remember how many people

9   were on the interview committee?

10      A.      I believe there was six or seven.

11      Q.      I'm going to ask you about these

12  people:  Scott Cummings was on the interview

13  committee?

14      A.      Yes, sir.

15      Q.      And you knew Scott?

16      A.      Yes, sir.

17      Q.      Do you know how old Scott was at

18  the time?

19      A.      No, sir.

20      Q.      Eric Carson was on the interview

21  committee?

22      A.      Yes, sir.

23      Q.      And you knew Eric Carson?

1          A.     Yes, sir from my previous two

2    interviews.

3          Q.     And he works for the board.

4          A.     Yes, sir.

5          Q.     Do you know how old he was at the

6    time of the interview?

7          A.     No, sir.

8          Q.     And then there was a Michael

9    Thompson.  Do you know Michael Thompson?

10         A.     I don't know who he is.  The name

11   sounds familiar, but I don't know who he is.

12         Q.     Do you know how old he is?

13         A.     No, sir.  There were two younger

14   men on the board that I would say in their late

15   20s, but I don't know.

16         Q.     And then Derrick Godfrey works for

17   the board, do you know him?

18         A.     I don't know him.

19         Q.     Do you know how old he is?

20         A.     No, sir.

21         Q.     And then Charles Howard worked for

22   the board, do you know him?

23         A.     I don't know him.

```
1        Q.    And do you know how old he is?

2        A.    No, sir.

3        Q.    And then there was a Jill Holland?

4        A.    Yes, sir.

5        Q.    Do you know her?

6        A.    I know who she is.

7        Q.    Do you know how old she is?

8        A.    No, sir, I don't know.

9        Q.    And Kathy Bullard, do you know

10  her?

11       A.    I don't know her, but I believe

12  she's the lady that was sitting right next to

13  me.

14       Q.    Do you know how old she is?

15       A.    No, I don't.

16       Q.    Do you know whether or not any of

17  the people on the interview committee were in

18  their '50s?

19       A.    I would think that the last lady

20  you mentioned probably was, but that's a guess.

21       Q.    How long did the interview last?

22       A.    I think it was 30 minutes, 20

23  minutes -- 30 minutes, somewhere in that area.
```

1    A.    Well, I can't recall all of the

2  questions right now.  I just -- I think some

3  were asking about my -- well, I can't think --

4  no, I'm sorry I just can't recall any right now.

5    Q.    Do you recall admitting during the

6  interview that you had not read the job

7  description?

8    A.    I do recall that I had not read

9  the revised job description, because it came out

10  while I was on sick leave.

11    Q.    Well, did you read the first job

12  description?

13    A.    Yes, sir.

14    Q.    But didn't read the revised one?

15    A.    That's correct.

16    Q.    Well at the time that you made

17  application and had the interview, what was your

18  understanding as to what you would be doing if

19  you were hired as the water distribution

20  manager?

21    A.    I would be interfacing with the

22  office staff to process work orders, which would

23  be customer complaints, new services, meter

1       A.      That's correct.

2       Q.      Do you recall admitting during

3   your interview that you were weak on paperwork

4   and documentation?

5       A.      No, sir, I never said that.

6       Q.      Did you say anything similar to

7   that?

8       A.      I said -- when they -- they said

9   what is your weakest area?  I said I don't have

10  any weak areas.  And they said, if you had to

11  name one.  And I said I hate doing paperwork and

12  I assume things that you don't like doing are

13  probably the things that you don't do as well,

14  but I also -- and I said but -- I use computers

15  a great deal and that makes up for the paperwork

16  and cuts way down on it.

17      Q.      As we sit here today are there any

18  other questions that you can think of that you

19  were asked or any other information that you

20  provided the interview committee?

21      A.      I remember being asked to

22  categorize some things in order of importance,

23  but I don't remember specifically what they

1    were, like customer service and employees and

2    things like that.  I remember being asked

3    several questions about contractors, but there

4    was no delineation of what they meant by

5    contractors -- whether it was contractors

6    working for the water board, or contractors

7    developing, or contractors building houses.

8    There was no identification as to what type of

9    contractor they were talking about.

10           Q.    What kind of questions were you

11   asked about the contractors?

12           A.    I don't remember specifically.  I

13   think they were saying that they had a lot of

14   problems with contractors in the area -- I don't

15   know what that means.

16           Q.    Did you ask them which kind of

17   contractor they were talking about?

18           A.    I didn't ask, because as long as I

19   wasn't asked a question about what they were

20   doing specifically -- I didn't ask.

21           Q.    Well, what was the nature of the

22   question:  How well do you get along with

23   contractors?  Can you handle contractors?  I

1      mean, what do you recall the question being?

2          A.      It was something of that sort:

3      Can you work with contractors?  Well, yeah, I've

4      worked with contractors for many, many years,

5      all types of contractors.

6          Q.      Where all have you worked with

7      contractors?

8          A.      Well, I had a great deal with -- I

9      worked with contractors at Mobile County Water,

10     Sewer and Fire Protection Authority.  We did

11     some major expansion while I was there, so that

12     was our contractors.  We dealt with house

13     builders and land developers all of the time.

14     It's just a matter of course.

15         Q.      How about with the City of Jackson

16     Water Board or Professional Services Group, did

17     you work with any contractors there?

18         A.      Yes, sir, I sure did.

19         Q.      What would be the nature of

20     working with contractors with Professional

21     Services Group when you were in Demopolis?

22         A.      We had land developers there.  And

23     we had a little bit of expansion of our own, but

1    mostly land developers and house builders.

2        Q.    How about Jackson Water Board?

3        A.    Again, mostly land developers and

4    house builders.  Most of the expansion we did,

5    we did on our own, in-house labor.

6        Q.    Now, in your complaint you allege

7    that when you entered the room one of the

8    individuals began shaking his head no and made

9    negative gestures and comments during the

10   interview?

11       A.    Correct.

12       Q.    I assume that was a male?

13       A.    Yes, sir.

14       Q.    Who is that person?

15       A.    I don't know the man's name.  He

16   was a younger man.  He was sitting around in the

17   middle of the table to my left near Scott

18   Cummings.

19       Q.    Was he black or white?

20       A.    White.

21       Q.    And you know it wasn't Scott or

22   Eric?

23       A.    No, sir.

```
 1          A.      No, I don't.

 2          Q.      Anything else you can remember

 3   other than he appeared to be stout?

 4          A.      No, sir.

 5          Q.      Did he ask you a question?

 6          A.      No, sir, he never asked a

 7   question.

 8          Q.      Well, there were, I guess, two

 9   white males there that, from your testimony, you

10   didn't know:  Michael Thompson and Derrick

11   Godfrey.  Did either of those ask you questions?

12          A.      Yes, sir.

13          Q.      One of them asked you questions?

14          A.      Yes, sir.  One asked me questions

15   regarding the computer software that I was

16   familiar with, which is an extensive list.

17          Q.      And then the other one is the one

18   that you say was shaking his head no and making

19   negative gestures?

20          A.      That's correct.

21          Q.      Because he did not ask you

22   questions?

23          A.      I don't recall him asking any
```

1    questions, no, sir.

2        Q.    Did you ask him why he was shaking

3    his head no?

4        A.    No, sir, I didn't.

5        Q.    Well, did anybody articulate any

6    reason why this person would be shaking his head

7    no?

8        A.    No, sir.

9        Q.    And you say throughout the

10   interview he made negative gestures?

11       A.    Well, he was just constantly

12   hanging his head down and shaking his head no,

13   and looking around and shaking his head no and

14   looking around.

15       Q.    Do you have any idea why he would

16   be doing that?

17       A.    I assume it meant that he didn't

18   like me, but that's an assumption.

19       Q.    Nobody's ever given you any reason

20   if that happened, why that happened?

21       A.    No, sir.

22       Q.    Did you ever talk to Scott or Rick

23   or anybody about that?

1      A.      No, sir.

2      Q.      How did the interview conclude?

3      A.      I'm not sure.

4      Q.      Well, I mean, were you satisfied

5  with the way it went?  Unhappy with the way it

6  went?

7      A.      Well, I don't know.  I felt like I

8  had made a good representation of myself.  I had

9  a closing statement in which I said that I had

10  already been with the company for a long time

11  and they knew the quality of my work and that

12  I'd like to get the promotion.

13      Q.      Had you had any disciplinary

14  actions, reprimands, or write-ups up to that

15  point as an employee?

16      A.      No, sir.

17      Q.      Now as you've articulated what you

18  understand that job involved, was there anything

19  from your position as chief operator that you

20  thought would provide a good background or was

21  similar to the new position that you were trying

22  to get?

23      A.      My knowledge of water would have

1    been a great asset dealing with customer

2    complaints.  The fact that I had previously, in

3    other jobs, handled billing systems and computer

4    networks and things of that sort, I also felt

5    that would help me to contribute to the overall

6    welfare of the operation.

7         Q.    How about in your position as

8    water plant operator -- was there anything in

9    that position that you thought provided a good

10   background, would have been an asset for the

11   position you were trying to get?

12        A.    My reliability and dedication to

13   the job, the fact that I knew the capacity and

14   the quality of the water that we were producing

15   and delivering to the citizens of Auburn.

16        Q.    How about in any of your prior

17   jobs that you had before you came with the water

18   board?

19        A.    I think in all of my -- well, in

20   most of my prior jobs the distribution system

21   had always been part of my responsibility.

22        Q.    Now let me ask you a question this

23   way:  In terms of your duties as chief operator,

1          A.      There would have been that, there

2     would have been customer complaints, there would

3     have been expansion projects that he would need

4     to review and comment on.

5          Q.      What's the next step that happened

6     after your interview?  What happened next in

7     terms of the promotion procedure?

8          A.      Well, again, there was a long

9     delay and I didn't hear anything for a while.

10    And I found out that someone had been hired for

11    the position, unofficially when I went into work

12    way day.  One of the other operators told me

13    that someone has been hired.

14         Q.      Who is that?

15         A.      Who?

16         Q.      Told you.

17         A.      Martin Squires, I believe, is the

18    first to tell me that.

19         Q.      Did he tell you how he knew?

20         A.      He said Rick McCarty told him.

21         Q.      Did he tell you who had been

22    hired?

23         A.      He didn't know the man's name.  He

1  said that he understood that he was working at a

2  store in the area and had no water experience at

3  all.

4          Q.      Anything else that Martin Squires

5  told you initially about the hire?

6          A.      I believe he told me that he

7  worked at a grocery store or that he thought he

8  had worked at a grocery store -- I believe

9  that's what he told me -- the he thought he

10 worked at a grocery store or a meat store or

11 something of that sort.

12         Q.      And that's the first word that you

13 heard?

14         A.      That's correct.

15         Q.      Did Martin tell you when he found

16 out?

17         A.      No, sir.

18         Q.      What did you do with that

19 information?

20         A.      I waited for Rick McCarty to come

21 to work.

22         Q.      And did you talk to Rick that

23 day?

```
 1          A.      Yes, sir, I did.

 2          Q.      What was y'all's conversation?

 3          A.      The conversation was that someone

 4     had been hired and he had no experience, but he

 5     was a younger man and there was going to be a

 6     stiff learning curve on this new job, and so

 7     they felt like he would be a better fit.

 8          Q.      Now, did Rick refer to him as a

 9     younger man?

10          A.      Yes, sir.

11          Q.      He used those words?

12          A.      Yes, sir.

13          Q.      Did he tell you how he knew that?

14          A.      No, sir, he didn't.

15          Q.      Did Rick know who he was?

16          A.      I don't believe he told me his

17     name.  I don't know if he knew it or just didn't

18     tell me.

19          Q.      How did he know he was a younger

20     man?

21          A.      I don't know.

22          Q.      Now, on your application for that

23     position, isn't it true there was nowhere to put
```

1    your age or date of birth?

2         A.    I don't recall that -- probably

3    not -- I don't recall.

4         Q.    And Rick was not on the interview

5    committee?

6         A.    No, sir, he wasn't.

7         Q.    Do you know of any input that Rick

8    had in terms of the promotion?

9         A.    No, sir.

10         Q.    Did he make any comments in this

11    conversation where he told you that this was a

12    younger man and there was going to be a stiff

13    learning curve -- did he make any comments that

14    the person who was selected for that position

15    was hired because he was younger?

16         A.    No, sir.  He just said that that's

17    what he had been told and that I would be a

18    better fit where I was, according to Scott.  He

19    said Scott said that -- he was telling me what

20    Scott had said.

21         Q.    Did you ask Rick the significance

22    of being told there was a stiff learning curve?

23         A.    I gave Rick a quick rundown of my

1    education and my abilities, and I told him I'm

2    just being discriminated against flat-out.

3         Q.    In that first conversation you

4    told him that?

5         A.    Yes, sir, sure did.

6         Q.    Well, what did you understand when

7    Rick said that there was going to be a stiff

8    learning curve?  What did you understand that

9    meant?

10        A.    Well, I'm not -- at the time I

11   didn't have any idea what that meant, but

12   apparently if you don't know anything at all

13   about the job it's a pretty steep learning

14   curve.

15        Q.    Well, why did you think

16   immediately that you were being discriminated

17   against?

18        A.    Because I'm not a person that

19   needs -- you don't need to be concerned about a

20   learning curve to me.  I'm quite capable of

21   learning things very quickly.

22        Q.    Well, assume that's true.  Just

23   because they hire somebody else, why does that

1    mean they discriminate against you?

2         A.    Well, as I said, I was told that

3    they hired a younger man.

4         Q.    By Rick?

5         A.    Yes, sir.

6         Q.    Who did not elaborate to you that

7    that was the reason the person was hired?

8         A.    No, sir, he did not.

9         Q.    But you just assumed that at that

10   point?

11        A.    I assumed at that point that if

12   they hired a younger man with no experience

13   instead of hiring an experienced older man they

14   were being discriminatory, yes, sir.

15        Q.    And do you know how old the person

16   is that was hired?

17        A.    No, sir, I don't know his age.

18        Q.    Have you ever seen him?

19        A.    Yes, sir, I have met him.

20        Q.    So what happened after you had

21   this conversation with Rick?  What did you do

22   next?

23        A.    Rick immediately got on the

 1    telephone after I told him that I was being

 2    discriminated against, that I felt that I was

 3    being discriminated against.  He got on the

 4    telephone, and then he took his portable phone

 5    and left the office and went out back behind the

 6    building so that the people in the office

 7    couldn't hear what was being said.  And then he

 8    came back later and told me that Scott Cummings

 9    wanted to talk to me.

10         Q.    Did you talk to Scott?

11         A.    Yes, sir, I did talk to Scott.  I

12    believe I talked to him on the telephone just

13    long enough for him to tell me that he wanted to

14    set up an appointment to meet with me.

15         Q.    Did y'all set up an appointment?

16         A.    Yes, sir.

17         Q.    Where was the appointment?

18         A.    He came to the water plant where I

19    was working.

20         Q.    Who was present during the meeting

21    with you and Scott?

22         A.    He closed the door so there was

23    only he and I.

```
1          Q.     And nothing about that meeting was

2     taped, right?

3          A.     No, sir.

4          Q.     Did Rick tell you he thought you

5     would be a better fit or that Scott had said --

6          A.     Scott said that, that's what he

7     said.

8          Q.     Did you ask Rick what he meant by

9     that?

10          A.     No, sir.  At that point I was

11     angry.

12          Q.     So what went on in this

13     conversation between and you Scott?

14          A.     Scott told me that they had hired

15     this other man because he thought they had -- he

16     had more experience in dealing with the public,

17     which I thought was odd.  And he went on to tell

18     me that he wanted to hire someone in this

19     position that would be there for a long time,

20     indicating to me that he thought I was too old.

21          Q.     What else was said in that

22     conversation between the two of you?

23          A.     I don't recall anything else.
```

```
1    There was more conversation, some of it was
2    trivial matters.  I believe I explained to him
3    how I happened to be working there in Auburn in
4    the first place and why I had been willing to
5    settle for an operator's job.
6         Q.    Well, why had you been willing to
7    settle for an operator's job?
8         A.    Well, because I had just gone
9    through a divorce, a lost job and some problems
10   with one of my daughters.
11        Q.    But nobody from Auburn promised
12   you anything other than offering you a job as a
13   water plant operator, did they?
14        A.    No, they didn't.
15        Q.    What was Scott's response to that?
16        A.    He just said he wished he'd known
17   all of that earlier.
18        Q.    Anything else that y'all talked
19   about?
20        A.    Again, we talked about a good
21   bit -- some of the things trivial -- and I don't
22   recall the whole conversation.
23        Q.    Why did you think it was odd that
```

1    Scott said the person that was hired had more

2    experience dealing with the public?

3         A.     Well as I said, I've been in the

4    utility business for quite a while.  And when

5    you are in the utility business you don't have

6    one or two customers -- you have thousands of

7    customers and you have to deal with some of them

8    all the time -- it's a constant thing.

9         Q.     Yeah, but when we went through

10   your employment earlier this morning you didn't

11   indicate that you had any extensive experience

12   dealing with customers.

13        A.     As a manager, anything that

14   anybody couldn't handle whether it was in the

15   distribution system, the billing office or even

16   the fire system, I had to handle it.  Some of

17   the customers actually would ask to see me when

18   they first came in the door.  They didn't want

19   to talk to anybody but the manager.

20        Q.     Well, would that have been the

21   case at Professional Services Group?

22        A.     Yes, sir.

23        Q.     Was that one of the reasons why it

1    lost a contract with Demopolis because the

2    customer complaints were not being handled

3    properly?

4         A.    No, sir.  As a matter of fact,

5    while I was there we renewed the contract, we

6    went through a three-year contract and renewed

7    the contract again.

8         Q.    But you were there when they

9    decided to drop the contract?

10        A.    Yes, sir, I was.

11        Q.    When he made the statement,

12   according to you, that he wanted to hire someone

13   who would be there for a long time, why did that

14   indicate to you that you were too old?

15        A.    Well, I assume that he was saying

16   that I'm too -- he asked -- in fact now that you

17   said that, I do recall.  He asked how long it

18   was to my retirement age, so he was definitely

19   aiming that toward my retirement age -- but I

20   recall him asking how long before you are going

21   to be retiring.

22        Q.    Now, when did he ask you that?

23        A.    Sometime during the conversation.

1         Q.    What did you tell him?

2         A.    I told him I assumed I would work

3  until I died, I believe.

4         Q.    And after that is when you claim

5  he made the comment that he wanted to hire

6  somebody to be there a long time?

7         A.    Yes, sir.

8         Q.    I want to be clear on this.  You

9  said that after you told Scott about why you

10  wound up at Auburn and going through a divorce

11  and a problem you had with your daughter, that

12  he'd wished he'd known that.  Did he make any

13  comment --

14         A.    He didn't make any further

15  comment.

16         Q.    Well, what percent of your job

17  would you say dealt with the public when you

18  worked at Professional Services Group?

19         A.    Probably 20 percent.

20         Q.    Twenty percent of your time was

21  spent on customer complaints?

22         A.    Yes, sir.

23         Q.    How about Water Board of the City

1    of Jackson?

2         A.    Probably -- well, it varied there

3    because we had some issues where I had constant

4    every day, nothing but customer complaints when

5    I first arrived.  We were able to work out those

6    issues, and it settled down after a few months

7    to probably 10 or 15 percent.

8         Q.    Did you tell Scott during this

9    first conversation that you thought you were

10   being discriminated against?

11        A.    Yes, sir.

12        Q.    What did he say about that?

13        A.    He didn't make any comment.

14        Q.    Did you tell him you planned on

15   suing?

16        A.    No, sir, I did not.  I did tell

17   him that I thought bad things happen because

18   good people didn't stand up for themselves.

19        Q.    What did he say about that?

20        A.    He didn't make any comment.

21        Q.    What's the next thing that

22   happened?  Did you have anymore conversations

23   with Rick or Scott?

1          A.     I worked with Rick every day.

2          Q.     Did y'all talk about this?

3          A.     Scott made several visits to the

4     plant specifically to talk to me and to discuss

5     this, all of the time trying to tell me that I

6     should be happy right where I am.

7          Q.     How many conversations did you

8     have with Scott altogether?

9                 MR. COOKS:  Object to the

10    form.  You mean subsequent to the one we just

11    got through talking about.

12                MR. MORGAN:  Yeah.

13         Q.     (Mr. Morgan)  Counting the first

14    one, how many did you have with him altogether?

15         A.     Three or four -- I'm not sure --

16    some of them on the phone and two or three here

17    at the plant.

18         Q.     And what was discussed in these

19    subsequent meetings?

20         A.     As I said he assumed to say that I

21    ought to be quite content where I was -- that I

22    was doing a good job, he was happy with my work,

23    and that I should be happy there.

1      Q.     And what would you say to him?

2      A.     I said the other job pays twice as

3   much.

4      Q.     And what did he say?

5      A.     No comment.

6      Q.     Well, did he make anymore

7   references -- do you claim he made anymore

8   references in any of these other conversations

9   about retirement, your age, a longtime employee

10  or anything?

11     A.     No, sir.  The message I got from

12  Rick McCarty was that the Human Resources

13  Department had said that we could no longer talk

14  and discuss the matter.

15     Q.     That who could no longer talk and

16  discuss the matter?

17     A.     Rick and I, or Scott and I.

18     Q.     But you said Scott came out there

19  and talked to you two or three times?

20     A.     This was after -- prior to the --

21  what Rick telling me that Human Resources said

22  that we couldn't talk anymore.

23     Q.     Were you still employed with the

1    water board when you filed your EEOC complaint,

2    or did you file your EEOC complaint after you

3    left the water board?

4         A.    I was still employed with the

5    water board.

6         Q.    Well, did you have two or three

7    conversations with Scott in addition with that

8    first one before Rick said y'all couldn't talk

9    about it?

10        A.    Yes, sir.

11        Q.    Did Scott, in any of those

12   conversations, do you claim he made any

13   statements about your age, or retirement, or

14   younger employee, or working there a long time,

15   or anything in any of those subsequent

16   conversations?

17        A.    As I said in the subsequent

18   conversations, he kept trying to convince me

19   that I should be just happy right where I was.

20        Q.    So to answer to my question, there

21   were no more comments about somebody being there

22   a long time, or your retirement or anything?

23        A.    No, sir.

1          A.    Not directly this matter.

2          Q.    Well, what indirectly did you

3     have?

4          A.    As I said I was told that I was

5     going to have to go out and perform some of the

6     duties.

7          Q.    I'm going to get to that in just a

8     minute.  How about Scott, anymore conversations

9     with Scott about the promotion and not getting

10    it?

11         A.    The same type of indirect

12    conversation.

13         Q.    Well, what did Rick and Scott,

14    either one or both, tell you that you had to do

15    that you don't think you should have done?

16         A.    I was told that the new man had

17    caused an upset in the water lines in a certain

18    part of town, and that he wasn't qualified to

19    take the samples, and they wanted to take

20    samples out there to assure everyone that the

21    water was safe to drink.  As a matter of fact

22    Kyle, himself called me.

23         Q.    He talked to you?

1       A.    Yes, sir.  He told me he needed me

2  to handle the customer complaints.

3       Q.    Well, how does Rick get involved

4  indirectly?

5       A.    Rick was not present at the time.

6  But I had a raise that I was due, the raise was

7  held up, and a comment on my evaluation was that

8  I failed to cooperate with the distribution crew

9  in collecting samples or something to that

10  effect.

11       Q.    And so you discussed it with Rick?

12       A.    Yes, sir.

13       Q.    Rick never asked you to go do

14  something for the distribution manager?

15       A.    No, sir.  Rick did not.  Rick was

16  not present at the time.

17       Q.    Your indirect conversation about

18  all of this was Rick, was your raise held up?

19       A.    Rick told me about the problems

20  and the distribution system.

21       Q.    That he was upset because there

22  were some water line problems?

23       A.    Yes, sir.

1    Q.    Rick told you that?

2    A.    Yes, sir, Rick told me about the

3    upset in the distribution system.  Kyle called

4    me to go out and work on it.

5    Q.    What area of town was this?

6    A.    I don't know.

7    Q.    Well, at what point did Rick tell

8    you that people were upset because of something

9    the distribution person had caused in the water

10   line?  Was that when you were talking to him

11   about your raise?

12   A.    No, sir.  No, sir, he had been to

13   a visit at the office and he came back and said

14   there are some problems in this one subdivision

15   because of a pump that was turned on and the

16   water lines weren't flushed prior to turning it

17   on, and as a result the water is brown all over

18   the neighborhood.

19   Q.    Is that before or after Kyle asked

20   you to go ask out and take some samples?

21   A.    Kyle called me later that same day

22   telling me he needed me to go out and fix it.

23   Q.    So Rick told you about the problem

1    earlier and then Kyle -- well, did Rick say it

2    was Kyle's fault?

3         A.    He didn't say whose fault it was.

4    It's a distribution system problem -- it's the

5    distribution system manager's fault.

6         Q.    And so Kyle called and asked you

7    to go out and fix it that same day?

8         A.    Told me that he needed me to go do

9    this, I was supposed to go do this.  I was

10   supposed to go take samples and supposed to go

11   talk to the customers and calm them down.  I

12   told him I would have to talk to Scott before I

13   could do that.

14        Q.    And that was a conversation that

15   you had directly with Kyle?

16        A.    Yes, sir.

17        Q.    Rick didn't through some third

18   party, tell you you needed to do that -- Kyle

19   told you you needed to do that?

20        A.    Kyle told me that.

21        Q.    Why would you have to talk to

22   Scott?

23        A.    Because I didn't think it was my

1    duty to go out and do this man's job for him.

2        Q.    Wouldn't Kyle have been your

3    superior?

4        A.    No, sir.  According to -- what I

5    was told the job description was revised to be

6    he had no authority over the water plant.

7        Q.    Did you make the comment at that

8    time or later in regard to this request from

9    Kyle that you were not going to be a team

10   player?

11       A.    No, sir.

12       Q.    You never made the statement that

13   you were not going to be a team player?

14       A.    No, sir, I have never made that

15   statement.

16       Q.    Did you talk to Scott about it?

17       A.    Scott phoned -- well, actually I

18   believe I called Scott and he wasn't in, and I

19   left a message and he called back.

20       Q.    What happened when you talked to

21   Scott?

22       A.    Told him I didn't think it was my

23   responsibility.  It should be the job of the

1    distribution system manager to take care of

2    those problems.

3         Q.    What did Scott say?

4         A.    Scott said, well, okay if you feel

5    that way fine, and slammed the phone down.

6         Q.    So did you do it?

7         A.    No, sir.  I had already explained

8    to Kyle that I had no transportation.  The truck

9    that I normally drove was broke down, I wouldn't

10   have any transportation to get out there.

11        Q.    I thought you told Kyle you had to

12   talk to Scott?

13        A.    Kyle said he would send somebody

14   to pick me up and take me out there, and I said

15   I'm going to have to talk to Scott first.

16        Q.    So it wasn't a matter of

17   transportation, they could have gotten you

18   there?

19        A.    No, they could have gotten me

20   there, that's right.

21        Q.    You just didn't do it because you

22   didn't get the job.

23        A.    Because it wasn't my job to do

1    that.  It wasn't my job to do that.  My job was

2    to work at the water treatment plant.

3         Q.    I thought you said part of your

4    job as a chief operator was to take samples

5    outside?

6         A.    That's correct.  To take

7    bacteriological samples for the monthly state

8    requirement.

9         Q.    So even though this is something

10   that would have been necessary for the proper

11   operation of a water board and distribution of

12   water and that Scott had asked you to do it, you

13   weren't going to do it?

14                   MR. COOKS:  Object to the

15   form.

16        A.    I didn't tell Scott I wouldn't do

17   it.  I told him I didn't think it was my

18   responsibility.  When he hung -- slammed the

19   phone down in my face -- I assumed he didn't

20   need me to do it.

21        Q.    (Mr. Morgan)  Is he your superior?

22        A.    Yes, sir, Scott is.

23        Q.    Is that the way you handle or deal

```
 1            Q.     And that would be?
 2            A.     The fact that someone less
 3    qualified was hired because he was younger.
 4            Q.     Do you know Mr. Hildress'
 5    qualifications?
 6            A.     No, sir.
 7            Q.     My understanding is your lawsuit
 8    is -- your claim of discrimination is that you
 9    were not promoted because of your age?
10            A.     That's correct.
11            Q.     You don't make any other
12    employment claims?
13            A.     No.
14            Q.     It's a promotion claim?
15            A.     That's correct.
16            Q.     And the promotion claim is that
17    you didn't get promoted because of your age, or
18    flip-flopping it they promoted a younger person?
19            A.     An unqualified person, yes, sir.
20            Q.     Anything else that you think Rick
21    McCarty knows about your claim other than what
22    you just told me?
23            A.     No, sir.
```

1  Q. Has he made any comments about

2 Kyle being less qualified?

3  A. He told me that Scott told him on

4 the very first day that the man had no water

5 experience.

6  Q. And that's the basis of saying

7 he's less qualified because he has no water

8 experience?

9  A. Yes, sir.

10  Q. And you said also that Rick told

11 you in that first conversation that Scott said

12 he was younger?

13  A. Yes, sir.

14  Q. Now to be clear, you don't make

15 any claim that Rick knows any first-hand

16 evidence about the reason you were not promoted

17 or that Kyle was promoted?

18  A. I would assume that he knows what

19 Scott told him.

20  Q. Because Rick was not involved in

21 the process?

22  A. Not to my knowledge.

23  Q. And did not make the decision?

```
 1          A.      Not to my knowledge.

 2          Q.      Then you listed Scott Cummings.

 3          A.      Yes, sir.

 4          Q.      What do you claim Scott Cummings

 5   knows about your lawsuit?

 6          A.      I think Scott Cummings instigated

 7   the discrimination and I think he's entirely

 8   responsible for it.

 9          Q.      Why do you say that?

10          A.      Because he was not only the

11   manager, but he led the board -- he made the

12   decision.

13          Q.      Anything else that you say Scott

14   knows about this lawsuit?

15          A.      None, I don't have anything else.

16   I think he knows everything about it, that's

17   what I think he knows.

18          Q.      Martin Squires, you have him

19   listed -- what is it that you think he knows?

20          A.      He only knows what he was told.

21          Q.      By Rick?

22          A.      By Rick.

23          Q.      Do you know of anything that
```

1    I received from her regarding the change, that's

2    all.

3         Q.    Do you remember if you were asked

4    by the interview committee anything about your

5    supervisory experience?

6         A.    I'm sure I must have been, I don't

7    recall specifically.

8         Q.    Do you recall any information or

9    statements that you made to the interview

10   committee about your supervisory experience?

11        A.    No, I don't recall any specifics.

12   Most of my work prior to going or being employed

13   at Auburn was supervisory.

14        Q.    My question is -- I want to be

15   clear -- I want to know what you remember

16   telling the interview committee about your

17   supervisory experience?

18        A.    I don't recall any specifics.

19        Q.    Do you remember relating or

20   sharing any information with the interview

21   committee about your handling or experience with

22   customer relations?

23        A.    Yeah, I'm sure that that was

1    discussed.

2         Q.    What do you remember telling them?

3         A.    Well, I think there was some

4    comment about Jill being a very tough person to

5    deal with, and I remember telling them that in

6    Jill's position she has to be a tough person to

7    deal with, because that's one of the things that

8    I used to tell my clerks was you never blink

9    with a customer.  You are sympathetic, you

10   listen to what they have to say, but you never

11   say wait a minute did I make a mistake, you know

12   you don't do that.  You check -- if you think

13   you made a mistake you stop and you look, and

14   then you go back, but you don't ever blink in

15   front of a customer.  Because if you do, you

16   only prolong an argument that you don't have to

17   have.

18        Q.    Anything else that you remember

19   discussing with your interview board about your

20   experience with customer relations.

21        A.    Just that I had quite a bit of

22   experience with customer relations, dealing with

23   customers in the billing office and in the

1   field.

2          Q.     Did you have any conversations or

3   present any information to the interview

4   committee about your experience in managing

5   staff or operations?

6          A.     I remember being questioned about

7   the number of employees that I had supervised in

8   the past.

9          Q.     What did you tell them

10  specifically about that?

11         A.     Well, I just told them basically

12  the same thing today:  How many employees that I

13  had worked with at each job.

14         Q.     Did they go through the various

15  positions that you've held and ask you about

16  those kind of things that we talked about

17  earlier?

18         A.     I don't think we went all the way

19  through the list.  I was asked about particular

20  places:  How many here, how many there, that

21  kind of thing.

22         Q.     Did you provide any information or

23  were you asked any questions or share any

1    A.    He said he didn't know what the

2  man had done for a living.  It wasn't a personal

3  comment about the man -- I didn't know the man.

4  I was talking about the type of work that he

5  did.

6    Q.    Are there any conversations that

7  you've had with Scott about the promotion

8  procedure, your not being promoted, or this

9  lawsuit that we haven't covered in this

10 deposition?

11   A.    I don't recall anything.  I think

12 we've covered certainly the major issues.

13   Q.    Now as to Rick, are there any

14 conversations you had with Rick about this

15 promotion procedure, or your employment, or this

16 lawsuit, or your age that we haven't covered?

17   A.    The only thing I think we have not

18 covered was the evaluation where my raise was

19 held up and I had negative comments on my

20 evaluation.

21   Q.    Was that after this incident that

22 you told me about with Kyle calling and asking

23 you to take samples?

1      A.    Yes, sir.

2      Q.    What conversations did you have

3  with Rick about that?

4      A.    I told him that it was obvious

5  that this was some retribution because I was

6  objecting to doing another man's job.

7      Q.    What did Rick say?

8      A.    He didn't really comment.  He said

9  well, you know, Norman, Scott put these comments

10  on them, I didn't -- is what he said.

11      Q.    Did you get your raise?

12      A.    I believe I eventually did get the

13  raise, but it was delayed.

14      Q.    And my understanding was you

15  submitted a letter of resignation to the board?

16      A.    Yes, sir, I did.

17      Q.    At the time you sent that letter

18  of resignation you had already been working with

19  Kellogg, Brown and Root, hadn't you?

20      A.    I had accepted a position with

21  Kellogg, Brown and Root, that's correct.

22      Q.    Now, tell me what evidence you

23  have that you were denied that promotion because

1    of your age?

2              MR. COOKS:  Object to the

3    form.

4         A.    I think the evidence is in my

5    background, I think it speaks for itself.  I was

6    eminently qualified for the job and I don't

7    think I was ever actually given a chance to be

8    even considered for the position.

9         Q.    (Mr. Morgan)  Why not?

10        A.    As I said when I went in there was

11   one man shaking his head no -- apparently job

12   experience doesn't count for anything.  The fact

13   that I had a very positive work record with

14   Auburn didn't count for anything.  I was under

15   the impression that there was veteran's

16   preference given to city employees -- Scott

17   tells me he never heard of that.  So I felt like

18   I was discriminated against, yes, sir.  And I

19   think it's all there in the records in my

20   resume.

21        Q.    When did you have the conversation

22   with Scott about the veteran's preference?

23        A.    That was one of the conversations

```
 1   he and I had after I didn't get the position.
 2       Q.    What was said by who?
 3       A.    I don't recall specifically.  I
 4   just -- I just -- I remember asking him and is
 5   this man a veteran, was he a veteran?  Well, no
 6   he wasn't a veteran, Norman.  And I said isn't
 7   there a veteran preference, don't you give
 8   veteran's preference.  And he said I've never
 9   heard of veteran's preference.
10       Q.    Anything else that you can
11   remember about any of these conversations with
12   Scott?
13       A.    I'm sure that there was a lot
14   discussed and I'm sure that after a year I don't
15   recall everything that was said.
16       Q.    Well, have we covered everything
17   that you do remember?
18       A.    Yes, sir.
19       Q.    Is there anything else that you
20   rely on for your claim that you were not
21   promoted because of your age?  Has anybody ever
22   told you you didn't get this promotion because
23   of your age?
```

1          A.      I think Scott told me that when he

2     said he wanted somebody that was going to be in

3     that position for a long time.  I think that's

4     exactly what he was saying.

5          Q.      Anybody else that you claim made

6     any comments like that other than Scott?

7          A.      The comment that Rick said Scott

8     made about there being a steep learning curve.

9     Seemed to me that every excuse they came up

10    with, when I refuted that excuse they had a

11    brand-new one.

12         Q.      Well, when you had the

13    conversation with Rick about the steep learning

14    curve, the decision had already been made to

15    hire somebody else?

16         A.      Yes, sir.

17         Q.      Did you ever discuss that with

18    Scott?

19         A.      Yes, sir.

20         Q.      What did he say?  What was his

21    explanation?

22         A.      He dismissed that right off.

23    Apparently that had been communicated back to

1    him in the conversation on the phone he had with

2    Rick, because he just dismissed that right away

3    and didn't say anything else.  Then he started

4    talking about this man has had so much more

5    experience with customer relations.  And when I

6    dismissed that, when I explained to him that

7    that wasn't the case and proved it to him, it

8    was something else.  You know it was just one

9    little excuse after another.  But when he told

10   me that he wanted someone in that position a

11   long time that was the reason -- that was the

12   reason.

13        Q.    Any other comments made by Scott

14   or anybody else that support your claim?

15        A.    I don't recall anything else.

16        Q.    Tell me how you claim you've been

17   damaged in this lawsuit.  What damages do you

18   seek?

19        A.    I've had to leave a secure job, go

20   halfway around the world to be shot at, knowing

21   that it's not a permanent job.  I felt like I

22   was being persecuted there where I was.  I was

23   not happy because of the things that were being

```
 1    a year I can't be sure of what all I did lose.

 2    A lot of the things I had in storage and a lot

 3    of the things are packed away.

 4         Q.    Did you take any of that off of

 5    your taxes?

 6         A.    I have not, no, sir.

 7         Q.    Do you have a contract with

 8    Kellogg?

 9         A.    Yes, sir.

10         Q.    A written contract?

11         A.    Yes, sir.

12         Q.    How long is the contract for?

13         A.    It's a three-year contract -- it's

14    actually one year at a time.

15         Q.    Just rolls over?

16         A.    Yes, sir.

17         Q.    And you are now into your second

18    contract -- second year?

19         A.    I will be -- when I go back I will

20    start my second contract -- second year.

21         Q.    What was the date of your first

22    year?

23         A.    The 18th -- July the 18th.
```

# EXHIBIT "B"

## AFFIDAVIT OF STEVE REEVES

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,

  Plaintiff,

-vs-

CITY OF AUBURN,

  Defendant.

       Case No. 3:06-cv-1145-MEF

## AFFIDAVIT OF STEVEN REEVES

Before me, the undersigned authority, in and for said county and state, personally appeared Steven Reeves, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.  My name is Steven Reeves. I am a 47 year old male and I have personal knowledge of the matters set forth herein.

2.  I am the Human Resources Director for the City of Auburn.

3.  The Water Works Board for the City of Auburn ("the Board") is a public corporation under the laws of Alabama. The City of Auburn provides management services to the Water Works Board pursuant to the attached management agreement, including financial management, human resources management, risk management, information technology and day to day oversight of operations.

Further affiant saith not.

Respectfully submitted this _13_ day of December 2007.



EXHIBIT

B

tabbies®

_[signature]_

STEVEN REEVES

STATE OF ALABAMA        )
COUNTY OF LEE           )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **STEVEN REEVES**, who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_[signature]_

NOTARY PUBLIC

(SEAL)

My Commission Expires: _Mar 2, 2008_

2

EXHIBIT
B-"1"

STATE OF ALABAMA

·LEE COUNTY                              MANAGEMENT AGREEMENT

This agreement made and entered into on this the ___19th day
of ___July_____, 1983, by and between the City of Auburn, Alabama,
a municipal corporation, hereinafter referred to as "City", and
The Water Works Board of the City of Auburn, a public corporation
under the laws of Alabama, hereinafter referred to as "Board".

### STATEMENT OF BACKGROUND INFORMATION

1. Board is a separate entity within the City of Auburn
which is responsible for the construction, management,
administration and maintenance of the water system of the City of
Auburn.

2. City is a duly incorporated municipality within the State
of Alabama.

3. The parties do believe that it is in the best interest of
the City and the Board and would benefit the citizens of the City
of Auburn for the City and the Board to enter into a managment
contract under which the City would provide certain services to
Board, with the Board retaining its' autonmity and complete
authority for all policy decisions affecting the construction,
management, administration and maintenance of the water system of
the City of Auburn.

### STATEMENT OF AGREEMENT

1. The City does hereby agree to accept the management of
the water system of the City of Auburn, including but not limitd
to, all financial, accounting, collection, purchasing and
engineering functions necessary to administer and operate the
water system of the City of Auburn on a day to day basis under the
policy direction of the Board.

- 2 -

2.   The Board shall be responsible for making all policy decisions affecting the water system of the City of Auburn and the City shall have no authority or jurisdiction to make any such policy decisions.

3.   All employees of the Board shall remain employees of the Board and be covered by the group medical insurance, life insurance and retirement plans of the Board, except that the employees of the Board shall be subject to the pay plan, personnel rules and regulations and job descriptions adopted by the City. The Board shall retain its' authority to hire, discipline and discharge all employees of the Board.

4.   The Board does designate the City and its' duly authorized personnel or purchasing agent to purchase all commodities used by the Board and the Board does agree to adopt and follow the standardized purchasing procedures in force from time to time in the administration of the City.

5.   The Board shall maintain all hazard and liability insurance as now in force and carried by the Board, and in addition thereto, shall obtain and pay the premiums on such fidelity bonds on the employees of the City as may be required by the Board.

6.   The City shall furnish to the Board a monthly financial report of all income and expenses of the Board by the second Monday of the next following month, and shall make the books and records of all transactions affecting the water system of the City of Auburn available to the Board at any reasonable time during normal business hours.

7.   The Board shall hold the City harmless for any actions taken by City employees in carrying out the policy directives of the Board.

- 3 -

8.    The Board shall obtain a fidelity bond on the City's Finance Director in the amount of $25,000.00 to cover the performance of her duties while she is handling Board funds.

9.    During the term of this agreement, in order to insure the continued autonmity of the Board, the City does agree that in the appointment of new members to the Board, that it will not appoint sitting members of the Auburn City Council as it may be comprised from time to time.

10.    This agreement shall be effective as of July 1, 1983, and the City shall cease paying any fees which it is presently paying to the Board effective July 1, 1983.

11.    This agreement may be terminated by either party hereto who shall give to the other party 120 days prior written notice of its' intent to terminate; provided, however, that this agreement may not be terminated prior to January 1, 1984.

IN WITNESS WHEREOF, this agreement has been executed by the parties in duplicate, each of which shall constitute an original, on the day and date first above written.

ATTEST:

_____
Its City Manager

(SEAL)

ATTEST:

_____
Its Secretary

(SEAL)

CITY OF AUBURN, ALABAMA,
a municipal corporation

BY: _____
      Its Mayor

THE WATER WORKS BOARD OF THE CITY
OF AUBURN, a public corporation

BY: _____
      Its Chairman

- 4 -

STATE OF ALABAMA

COUNTY OF LEE

    I, _____Fairline S Cobb_____, a Notary Public in and for said State and County, hereby certify that Jan M. Dempsey, whose name as Mayor of the City of Auburn, Alabama, a municipal corporation, is signed to the foregoing agreement, and who is known to me, acknowledged before me on this day that, being informed of the contents of the agreement, she, as such Mayor and with full authority, executed the same for and as the act of the City of Auburn, Alabama.

    Given under my hand and official seal this the _19th_ day of _July_, 1983.

(NOTARY SEAL)

                                    Notary Public, State at Large

MY COMMISSION EXPIRES:
My Commission Expires
June 25, 1986

STATE OF ALABAMA

COUNTY OF LEE

    I, _____Debra P. Maddox_____, a Notary Public in and for said State and County, hereby certify that John C. Bailey, Jr., whose name as Chairman of The Water Works Board of the City of Auburn, a public corporation, is signed to the foregoing agreement, and who is known to me, acknowledged before me on this day that, being informed of the contents of the agreement, he, as such officer and with full authority, executed the same for and as the act of The Water Works Board of the City of Auburn.

    Given under my hand and official seal this the _12th_ day of _July_, 1983.

(NOTARY SEAL)

                        Debra P. Maddox
                        Notary Public, State at Large

MY COMMISSION EXPIRES:

MY COMMISSION EXPIRES
FEBRUARY 6th, 1984

# EXHIBIT "C"

## AFFIDAVIT OF SCOTT CUMMINGS

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                          :
                                          :
        Plaintiff,                        :
                                          :
-vs-                                      :        Case No. 3:06-cv-1145-MEF
                                          :
CITY OF AUBURN,                           :
                                          :
        Defendant.                        :
                                          :

### AFFIDAVIT OF SCOTT CUMMINGS

Before me, the undersigned authority, in and for said county and state, personally appeared Scott Cummings, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.      My name is Scott Cummings.  I am a 42 year old male and I have personal knowledge of the matters set forth herein.

2.      I was the director of the Water Resource Management Department for the City of Auburn from June 2005 through September 2007.  The City of Auburn has a management agreement with the Water Works Board of the City of Auburn ("the Board") which gave me responsibility to oversee operations of Auburn's water treatment and distribution and report to the Board.  The Board is a separate legal entity from the City of Auburn.

3.      During the course of my employment, there was a vacancy which led to opening the position for the Water Distribution Manager.  Of the applications received, I selected the top three candidates to be interviewed based on experience and

1



qualifications reflected in the applications and/or resumes. Some of the other interview committee members helped in this process to select the top candidates based on applications.

4.      In preparation for filling the Water Distribution Manager position, I selected a cross section of individuals who would be working with the person awarded the job. The interviewers were as follows: myself, Eric Carson, Mikel Thompson, Charles Howard, Jill Holland, Kathy Bullard and Derek Godfrey. The applicants were asked the same questions. After each interview, there was a discussion regarding the interviewers' observations of the applicants' responses to the questions, the qualifications of the applicant or any other issues that came up during the interview that was relevant to the Water Distribution Manager position. There was no decision made regarding who to hire until the completion of all three interviews.

5.      The applications that were submitted for the Water Distribution Manager position did not reflect anyone's age and at no time during the course of the interviews, nor the discussions that followed the interviews, were the ages of the applicants discussed. In fact, at no time during the hiring process for the position in question was the age of any applicant or the age of the person receiving the job discussed.

6.      After the interviews were concluded, all of the interviewers participated in a discussion to determine who was the best person for the job. It was a consensus among everyone that Kyle Hildreth was the top candidate based upon the qualifications we were looking for.

7.     Mr. Hildreth was selected as the candidate to be placed in the position. Compared to the other two candidates, his qualifications exceeded theirs in crucial areas of concern such as supervisory experience, customer relations, staff management and operations for clients' immediate needs and experience dealing with local contractors. While Mr. Lacey has some supervisory and management experience recorded on his application, this experience and background was not comparable to requirements of the Water Distribution Manager of the Board in terms of customer demands and system size. Also, the two jobs that Mr. Lacey held immediately prior to the promotion in question, Water Plant Operator and Chief Operator, were not in any way similar to what the Water Distribution Manager job entailed.

8.     While Kyle Hildreth did not have experience in water distribution, this was not a concern for us because he had many desirable and transferable skills that he had acquired as the manager of a concrete batch plant in Auburn. It is my understanding that in that position, Mr. Hildreth had extensive supervisory responsibilities, scheduling responsibilities and intense project work. It was apparent he could handle a stressful job. The committee simply felt like these qualifications exceeded that of the other two candidates.

9.     Additionally, Mr. Hildreth provided a very impressive interview. When answering the questions, he provided responses that were much more in line with what we were looking for than Mr. Lacey or the other candidate. In fact, Mr. Lacey responded poorly to basic questions about the job he was seeking. He admitted in the interview that he had not read the job description. When asked about this, he said that

3

he understood what the Water Distribution Manager did in the job only to later admit that the water plant (where he worked) was fairly isolated from the other employees and that he, in fact, did not know what the Water Distribution Manager did on a day to day basis. During the course of the interview, Mr. Lacey also admitted that he was weak on paperwork and documentation, which was a concern because of the importance of documentation for the Water Distribution Manager. Mr. Lacey also failed to give a good response to the questions about planning the staff work load for the week. (Interview notes for Mr. Lacey are attached hereto as Exhibit "1").

10.     After interviewing Mr. Lacey, I spoke to Mr. Lacey's supervisor in an attempt to gather information about Mr. Lacey's job experience because it did not seem in line with the information or attitude which Mr. Lacey revealed in the interview. I did not feel that I received any information from that supervisor that provided assistance or shed a better light on Mr. Lacey as a candidate for the job.

11.     I have always followed the Equal Opportunity Employment policies and worked closely with human resource staff and have never discriminated against any candidate because of their age or for any other reason. I never discussed Mr. Lacey's age with anyone. It was in my best interest to hire the most qualified person for the job in question and I would have never considered the person's age. It is my understanding that Mr. Lacey has said that I talked with him after the interview about wanting to hire a person that would be in the job for a long time and asked him about his retirement. This claim is untrue. Rather, I attempted to talk to Mr. Lacey about how he did during the

4

course of the interview. I did not compare him to others but tried to focus on areas

which were of a concern to the interview committee. At no time have I discussed

retirement or how long a person would stay in the job with Mr. Lacey or anyone on the

interview committee.

Further affiant saith not.


Respectfully submitted this 14th day of December 2007.

SCOTT CUMMINGS


STATE OF GEORGIA          )
COUNTY OF _Gwinnett_      )

    Before me the undersigned Notary Public in and for State and County aforesaid,
personally appeared **SCOTT CUMMINGS**, who is personally known to me and who,
being by me first duly sworn, doth depose and say that he signed the above affidavit to
the best of his knowledge, information and belief and with full understanding of its effect.

NOTARY PUBLIC

Reba S. Weir
Notary Public, Gwinnett County
Commission Expires April 9, 2011

(SEAL)                                    My Commission Expires:_____

5

EXHIBIT
C-"1"

## Water Distribution Manager Interview

Applicant _Norman Lacy_                    4-7-06

· Has not read job
  description
· Knew what Tony did

Later stated he did
not know how we are
structured or how we
operate

1. What do you feel is most important about this job?

     Staff        2
     Budget       4
     Customers    1
     Contractors  3

2. What do you feel is the most important aspect of managing people?
   · Listen

   How many people have you managed/supervise? - 12 to 15

3. What aspect of management is most difficult for you?
   · Separate personal feelings from
     doing what he knows is right.

4. Describe how you plan workload for the day – week?
   · Not a very clear response

5. Describe a stressful situation and how you responded?
   None mentioned

6. How do you budget/plan resources?

     Reactive
   → Proactive

7. Rate your communication skills?
     Written ⎤ – orderly
     Verbal  ⎦
     Documentation – important

· Wants to branch out
· Feels isolated s/w operations

8.  What do you feel is the most important aspect of the job for which you applied?

*get things going*

9.  Rate your knowledge of computers and software...

*Micro Soft Office Products*

10. Are you trainable?

*yes*

11. Are you more comfortable working with...people...independently?

*likes to interact but likes to work alone*

12. What makes you the most qualified applicant for the position?

*Experience in the field*

13. Customer complaint situational question....

14. What concerns you about your ability to perform the duties of Water Distribution Manager?

*none*

*Weakness - paperwork / documentation*

*Interview*

## Water Resource Management Department

### Applicant Evaluation Summary

| Name of Applicant: | *Norman Lacey* | Date: | *3-16-06* |
|---|---|---|---|
| Position Applied for: | *Water Distribution Manager* | Reviewer: | *Scott Cummings* |

Does the applicant satisfy the minimum criteria described in the job description? *Yes*

If not, describe what criteria, if any, would qualify the individual based on their qualifications versus the job description. _____

_____

_____

_____

List aspects that are positive concerning the applicant's application/resume.
*• many years experience in the water / wastewater utility business*

List aspects that are negative concerning the applicant's application/resume.
*• Does not appear to have experience dealing w/ public, scheduling resources, and managing budgets.*

Interview? _____   Type: phone/individual/panel  (circle all applicable)

List the interview team:

Comments from the interview concerning the applicant's capabilities
*• seems to be very orderly & may have difficulty handling the fast paced & sometimes stressful conditions*
*• left all 3 on the interview team w/ uneasy feeling that failed he could handle the job.*
*Demonstrate any initiative or motivation for the job.*
*• Never talked to me or supervisor about job.*

Is this individual the right person for the position? *No*

Why/Why Not? *See notes. Appears to be methodical but did not exhibit ability to lead Auburn into future.*
*• Talked w/ current supervisor about my issues and he could not offer any reason to think otherwise.*

# EXHIBIT "D"

## AFFIDAVIT OF ERIC CARSON

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                          :
                                          :
    Plaintiff,                          :
                                          :
-vs-                                      :        Case No. 3:06-cv-1145-MEF
                                          :
CITY OF AUBURN,                           :
                                          :
    Defendant.                          :
                                          :
                                          :

### AFFIDAVIT OF ERIC CARSON

    Before me, the undersigned authority, in and for said county and state, personally appeared Eric Carson, who being known to me and being first duly sworn, deposes and says under oath as follows:

    1.    My name is Eric Carson. I am a 42 year old male and I have personal knowledge of the matters set forth herein.

    2.    I am the Assistant Director of the Water Resource Management Department. I served on the Interview Committee when the Water Distribution Manager position had to be filled.

    3.    There were seven members of the Interview Committee. Mr. Cummings and I had questions that we asked each applicant. We rotated asking the questions during each interview. We asked the three applicants that were interviewed the same questions.



EXHIBIT
D

1

4.    Kyle Hildreth was my top choice for the position of Water Distribution Manager.  His background made him more qualified based on the criteria we were looking for.  He gave the best interview.

5.    At no time before, during or after the interview process was the age of any applicant discussed.  I never had a conversation with Scott Cummings or anyone else about the age of the three applicants that were interviewed or about whether we were looking for someone who was going to be in the job for a long time.

6.    After each interview, all the interviewers took part in discussing the candidate's performance during the interview, including qualifications of the applicant, concerns based on statements made during the interview by the applicant or other issues that may have arisen during the interview process.  At no time was age a part of those discussions or decision-making process.

Further affiant saith not.

Respectfully submitted this _13_ day of December 2007.


_____
ERIC CARSON


STATE OF ALABAMA          )
COUNTY OF LEE             )

    Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **ERIC CARSON**, who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.


_____

(SEAL)

NOTARY PUBLIC  *Karen C Howard*

My Commission Expires: 3.20.20 11

3

# EXHIBIT "E"

## AFFIDAVIT OF MIKEL THOMPSON

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                          :
                                          :
        Plaintiff,                        :
                                          :
-vs-                                      :        Case No. 3:06-cv-1145-MEF
                                          :
CITY OF AUBURN,                           :
                                          :
        Defendant.                        :
                                          :
                                          :

## AFFIDAVIT OF MIKEL THOMPSON

Before me, the undersigned authority, in and for said county and state, personally appeared Mikel Thompson, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.    My name is Mikel Thompson.  I am a 29 year old male and I have personal knowledge of the matters set forth herein.

2.    I am the Sewer Division Manager for the City of Auburn.  I served on the Interview Committee when the Water Distribution Manager position had to be filled.

3.    There were seven members of the Interview Committee.  I questioned each of the applicants during the interview process and the questions for each involved the same topics.

4.    Kyle Hildreth was my top choice for the position of Water Distribution Manager.  His background made him more qualified based on the criteria we were looking for.  He gave the best interview.

EXHIBIT
E

5.    At no time before, during or after the interview process was the age of any

applicant discussed.  I never had a conversation with Scott Cummings or anyone else

about the age of the three applicants that were interviewed or about whether we were

looking for someone who was going to be in the job for a long time.

6.    After each interview, all the interviewers took part in discussing the

candidate's performance during the interview, including qualifications of the applicant,

concerns based on statements made during the interview by the applicant or other

issues that may have arisen during the interview process.  At no time was age a part of

those discussions or decision-making process.

Further affiant saith not.

Respectfully submitted this ⅃3 day of December 2007.

MIKEL THOMPSON

STATE OF ALABAMA          )
COUNTY OF LEE             )

Before me the undersigned Notary Public in and for State and County aforesaid,
personally appeared **MIKEL THOMPSON**, who is personally known to me and who,
being by me first duly sworn, doth depose and say that he signed the above affidavit to
the best of his knowledge, information and belief and with full understanding of its effect.

NOTARY PUBLIC

(SEAL)

My Commission Expires: 3-20-2011

2

# EXHIBIT "F"

## AFFIDAVIT OF CHARLES HOWARD

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                          :
                                          :
        Plaintiff,                        :
                                          :
-vs-                                      :        Case No. 3:06-cv-1145-MEF
                                          :
CITY OF AUBURN,                           :
                                          :
        Defendant.                        :
                                          :
                                          :

## AFFIDAVIT OF CHARLES HOWARD

Before me, the undersigned authority, in and for said county and state,
personally appeared Charles Howard, who being known to me and being first duly
sworn, deposes and says under oath as follows:

1.      My name is Charles Howard. I am a 56 year old male and I have personal
knowledge of the matters set forth herein.

2.      I am the Heavy Equipment Operator of the Water Works Board of the City
of Auburn. I served on the Interview Committee when the Water Distribution Manager
position had to be filled.

3.      There were seven members of the Interview Committee. I did not ask questions
of the applicants during the interview process.

4.      Kyle Hildreth was my top choice for the position of Water Distribution
Manager. His background made him more qualified based on the criteria we were
looking for. He gave the best interview.

1



5.    At no time before, during or after the interview process was the age of any applicant discussed. I never had a conversation with Scott Cummings or anyone else about the age of the three applicants that were interviewed or about whether we were looking for someone who was going to be in the job for a long time.

6.    After each interview, all the interviewers took part in discussing the candidate's performance during the interview, including qualifications of the applicant, concerns based on statements made during the interview by the applicant or other issues that may have arisen during the interview process. At no time was age a part of those discussions or decision-making process.

Further affiant saith not.

Respectfully submitted this _13_ day of December 2007.

_Charles Howard_
CHARLES HOWARD

STATE OF ALABAMA            )
COUNTY OF LEE               )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **CHARLES HOWARD**, who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Karen C. Hammond_
NOTARY PUBLIC

(SEAL)                      My Commission Expires: 3-20-2011

2

# EXHIBIT "G"

## AFFIDAVIT OF JILL HOLLAND

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                          :
                                          :
        Plaintiff,                        :
                                          :
-vs-                                      :        Case No. 3:06-cv-1145-MEF
                                          :
CITY OF AUBURN,                           :
                                          :
        Defendant.                        :
                                          :
                                          :

## AFFIDAVIT OF JILL HOLLAND

Before me, the undersigned authority, in and for said county and state, personally appeared Jill Holland, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.      My name is Jill Holland. I am a 43 year old female and I have personal knowledge of the matters set forth herein.

2.      I am the Water Revenue Office Manager for the Water Works Board of the City of Auburn. I served on the Interview Committee when the Water Distribution Manager position had to be filled.

3.      There were seven members of the Interview Committee. I asked the three applicants the same questions during the interview process.

4.      Kyle Hildreth was my top choice for the position of Water Distribution Manager. His background made him more qualified based on the criteria we were looking for. He gave the best interview.

EXHIBIT
G

1

5.     At no time before, during or after the interview process was the age of any applicant discussed.  I never had a conversation with Scott Cummings or anyone else about the age of the three applicants that were interviewed or about whether we were looking for someone who was going to be in the job for a long time.

6.     After each interview, all the interviewers took part in discussing the candidate's performance during the interview, including qualifications of the applicant, concerns based on statements made during the interview by the applicant or other issues that may have arisen during the interview process.  At no time was age a part of those discussions or decision-making process.

Further affiant saith not.

Respectfully submitted this 13 day of December 2007.

JILL HOLLAND

STATE OF ALABAMA          )
COUNTY OF LEE             )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **JILL HOLLAND**, who is personally known to me and who, being by me first duly sworn, doth depose and say that she signed the above affidavit to the best of her knowledge, information and belief and with full understanding of its effect.

NOTARY PUBLIC

(SEAL)

My Commission Expires: 3-20-2011

2

# EXHIBIT "H"

## AFFIDAVIT OF KATHY BULLARD

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                          :

      Plaintiff,                       :

-vs-                                      :          Case No. 3:06-cv-1145-MEF

CITY OF AUBURN,                           :

      Defendant.                       :
                                    :

### AFFIDAVIT OF KATHY BULLARD

Before me, the undersigned authority, in and for said county and state, personally appeared Kathy Bullard, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.     My name is Kathy Bullard. I am a 60 year old female and I have personal knowledge of the matters set forth herein.

2.     I am the Utility Database Coordinator for the Water Works Board of the City of Auburn. I served on the Interview Committee when the Water Distribution Manager position had to be filled.

3.     There were seven members of the Interview Committee. I asked the three applicants follow up questions to their responses during their interviews.

4.     Kyle Hildreth was my top choice for the position of Water Distribution Manager. His background made him more qualified based on the criteria we were looking for. He gave the best interview.



EXHIBIT
H

1

5.    At no time before, during or after the interview process was the age of any applicant discussed.  I never had a conversation with Scott Cummings or anyone else about the age of the three applicants that were interviewed or about whether we were looking for someone who was going to be in the job for a long time.

6.    After each interview, all the interviewers took part in discussing the candidate's performance during the interview, including qualifications of the applicant, concerns based on statements made during the interview by the applicant or other issues that may have arisen during the interview process.  At no time was age a part of those discussions or decision-making process.

Further affiant saith not.

Respectfully submitted this 13 day of December 2007.

_Kathy Bullard_
KATHY BULLARD

STATE OF ALABAMA        )
COUNTY OF LEE           )

     Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **KATHY BULLARD**, who is personally known to me and who, being by me first duly sworn, doth depose and say that she signed the above affidavit to the best of her knowledge, information and belief and with full understanding of its effect.

_Karen C Hammond_
NOTARY PUBLIC

My Commission Expires: 3-20-2011

(SEAL)

# EXHIBIT "I"

## AFFIDAVIT OF DEREK GODFREY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NORMAN E. LACEY,                    :
      Plaintiff,                    :

                             :

-vs-                               :          Case No. 3:06-cv-1145-MEF

CITY OF AUBURN,                    :

      Defendant.                    :

                             :

## AFFIDAVIT OF DEREK GODFREY

Before me, the undersigned authority, in and for said county and state, personally appeared Derek Godfrey, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.     My name is Derek Godfrey.  I am a 39 year old male and I have personal knowledge of the matters set forth herein.

2.     I am the Water Coordinator for the Water Works Board of the City of Auburn.  I served on the Interview Committee when the Water Distribution Manager position had to be filled.

3.     There were seven members of the Interview Committee.  I asked the three applicants follow up questions to their responses during their interviews.

4.     Kyle Hildreth was my top choice for the position of Water Distribution Manager.  His background made him more qualified based on the criteria we were looking for.  He gave the best interview.

EXHIBIT

I

1

5.    At no time before, during or after the interview process was the age of any applicant discussed.  I never had a conversation with Scott Cummings or anyone else about the age of the three applicants that were interviewed or about whether we were looking for someone who was going to be in the job for a long time.

6.    After each interview, all the interviewers took part in discussing the candidate's performance during the interview, including qualifications of the applicant, concerns based on statements made during the interview by the applicant or other issues that may have arisen during the interview process.  At no time was age a part of those discussions or decision-making process.

Further affiant saith not.

Respectfully submitted this 13 day of December 2007.


_____
DEREK GODFREY


STATE OF ALABAMA          )
COUNTY OF LEE             )

       Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **DEREK GODFREY**, who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.


_____
NOTARY PUBLIC

(SEAL)

My Commission Expires: 3.30.2011

2

# EXHIBIT "J"

## HILDRETH DRIVER'S LICENSE



**EXHIBIT**

tabbies®

# EXHIBIT "K"

## HILDRETH APPLICATION FOR WATER DISTRIBUTION MANAGER



# CITY OF AUBURN
# EMPLOYMENT APPLICATION
PRINT IN INK OR TYPE. COMPLETE CAREFULLY & IN FULL
RÉSUMÉ MAY BE ATTACHED, BUT WILL NOT SUBSTITUTE FOR COMPLETION OF APPLICATION

City of Auburn

The City of Auburn is an Equal Opportunity Employer. It is our policy to provide equal employment opportunities for all individuals without regard to race, sex, age, religion, color, national origin, disability, or veteran status.

| NAME (Last) Hildreth | (First) Kyle | (Middle) Russell | SOCIAL SECURITY NO. 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 |
|---|---|---|---|

Any other name, such as nicknames, maiden name, or assumed name, needed to verify the contents of this application.

HOME PHONE (334) 887-6682

ADDRESS (Number and Street) 1109 E. Samford Ave.

ALTERNATE PHONE ( )

| CITY Auburn | STATE AL | ZIP CODE 36830 | E-MAIL ADDRESS hildreth6@netzero.net |
|---|---|---|---|

POSITION DESIRED Water Distribution Manager

Have you reviewed the job description? ☑ Yes ☐ No

TYPE OF EMPLOYMENT PREFERRED (please check only one)
☑ Regular/Full-Time    ☐ Regular/Part-Time
☐ Temporary/Full-Time    ☐ Temporary/Part-Time

Have you been previously employed with the City of Auburn? ☐ Yes ☑ No  If yes, list the dates of employment

Title _____ Department _____ Who was your supervisor? _____

## EDUCATION

| | Circle Year Completed | Major | Are you currently enrolled? | Degree Obtained |
|---|---|---|---|---|
| High School Auburn High | Fr. So. Jr. (Sr) GED | | Yes ☐ No ☒ | |
| Junior College Southern Union | (Fr) So. Jr. Sr. | | Yes ☐ No ☒ | |
| College Auburn University | Fr. So. Jr. (Sr) | Business Management | Yes ☐ No ☒ | B.S. |
| Graduate or Vocational School | | | Yes ☐ No ☐ | |

## EMPLOYMENT HISTORY - List entire employment history, starting with your present employer (attach additional sheets if necessary).

| | | |
|---|---|---|
| Company Name: Twin City Concrete | Position: Plant Manager | Last Pay Rate: 4313 /mo. |
| Address: 214 Twin City Ct. | Supervisor's name: Charles Bell | Hours Per Week: 50-70 |
| City / State / Zip: Auburn, AL 36830 | Dates Employed From: August 1988 | Reason for Leaving: |
| Phone #: 334-821-3363 | To: Present | |

| | | |
|---|---|---|
| Company Name: J&M Bookstore | Position: Stock Clerk | Last Pay Rate: $5.50 /hr |
| Address: 115 S. College St. | Supervisor's name: Wyman Hildreth | Hours Per Week: 30-45 |
| City / State / Zip: Auburn, AL 36830 | Dates Employed From: August 1980 | Reason for Leaving: School |
| Phone #: 334-887-7007 | To: November 1987 | |

| | | |
|---|---|---|
| Company Name: | Position: | Last Pay Rate: |
| Address: | Supervisor's name: | Hours Per Week: |
| City / State / Zip: | Dates Employed From: | Reason for Leaving: |
| Phone #: | To: | |

EXHIBIT K

May we contact the employers listed above? ☑ Yes ☐ No  If not, please indicate which one(s) you do not want us to contact _____

Briefly describe major duties of positions previously held and further details of qualifications. Daily operations of company; order and schedule delivery of materials and maintain inventory; schedule start times and supervise 18-20 employees; receive orders and prioritize delivery of shipments; work with customers to ensure satisfaction; maintain quality control; assist in processing payroll.

**PROFESSIONAL REGISTRATION, LICENSES, OR ACCREDITATION**

---

**OTHER INFORMATION AND SKILLS**

☐ Typing WPM _____    Microsoft Office Proficiency Level: ☐ Beginning    ☑ Intermediate    ☐ Advanced

☑ Multi-line Telephone    Computer Software Used: Word , Excel

Drivers License Number and State: 4862978    Alabama

Shop and Outdoor Equipment Used: Front End Loader

Other Equipment, Skills or Aptitudes: _____

Have you ever been discharged or forced to resign from employment? ☐ Yes    ☑ No    If yes, give name of employer(s) and reason(s) _____

Name of Relative(s) employed by the City of Auburn: _____

Relationship _____

---

Have you ever been convicted of a crime (felony or misdemeanor including DUI) other than minor traffic citations? ☐ Yes    ☑ No
If yes, give details (note: A criminal record is not necessarily a bar to employment. Each applicant is considered on an individual basis.)

---

| **U.S. MILITARY** | Branch of Service | | Dates From | To | Rank |
|---|---|---|---|---|---|
| Describe any training that you feel is relevant: | | | | | Type of Discharge: |

---

Are you prevented from lawfully becoming employed in this country because of VISA or immigration status? ☐ Yes    ☑ No
Proof of citizenship or immigration status will be required upon employment.

---

**Applicant's Agreement:**
I hereby state that the information given by me on this form and in any interview is certified to be true and complete. I understand that this information is subject to verification, and that if this information is later found to be untrue, incomplete, or misrepresented in any way, this will be cause for rejection of my application or, if already employed, for immediate dismissal. I also understand the **City of Auburn** may investigate my driving record and my criminal record, and that a background investigation, including a credit check, may be prepared whereby information is obtained through personal interviews with my neighbors, friends, and others with whom I am acquainted. This inquiry includes information as to my character, general reputation, and personal characteristics. I understand that I have the right to make a written request within a reasonable period of time to receive additional detailed information about the nature and scope of this investigation. I understand that the **City of Auburn** reserves the right to require me to submit to a medical examination, including a drug/alcohol test, prior to employment and at any time during employment to the extent permitted by law. I understand that the Employer's acceptance of this application does not indicate there are any positions open and does not in any way obligate the **City of Auburn**. Job applicants are required to submit to drug testing at or near the final stage of the hiring process. Any offer of employment will be conditional upon a negative drug test result. I understand that anything brought to or removed from the premises of the **City of Auburn** is subject to search at the City's election and I consent to such search. Specifically, I authorize the City, in its discretion, to search my desk, locker, or other areas for contraband in such circumstances when the City deems such search necessary or appropriate.
I understand that this application will be given every consideration, but it is not a promise of employment. I further understand that if I am hired my employment will be for no definite period, regardless of the period of payment of my wages. I understand that I have the right to terminate my employment at any time, with or without notice, and the **City of Auburn** has the same right. No one other than the City Manager of the **City of Auburn** has the authority to modify this relationship or to make any agreement to the contrary. Any such modification or agreement must be in writing.

**Applicant's Release:**
I hereby authorize any prior employers to provide such information concerning my employment with them as may be requested, and also authorize the Registrar's or Placement Office of all educational institutions attended to release an official copy of my transcript if requested. In addition, I authorize any law enforcement jurisdiction to release any information requested regarding my background to the City of Auburn.

**Selective Service Certification:**
I certify that I comply with the provisions of the United States Military Service Act (50 U.S.C. App 453) by having registered with the Selective Board or that I am not required by law to register.

APPLICANT'S SIGNATURE _Kyle R. Hildreth_    DATE 3-7-06

## DO NOT WRITE BELOW THIS LINE

TEST RESULTS _____