**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **NORMAN E. LACEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO: 3:06-CV-1145-MEF** |
| ) | |
| **CITY OF AUBURN,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT ON BEHALF OF DEFENDANT**

Comes Now Defendant City of Auburn in the above-styled cause and submits the following

memorandum brief and evidentiary materials in support of its motion for summary judgment.

*I.*
*SUMMARY OF PLAINTIFF'S ALLEGATIONS AND THE DEFENDANT'S AFFIRMATIVE DEFENSES*

This is an age discrimination case regarding a job at the Auburn Water Works Board for

Water Distribution Manager.[1]  Lacey sued the City of Auburn alleging that he was not promoted to

the position of Water Distribution Manager as a result of age discrimination pursuant to the federal

and state age discrimination statutes, codified at 29 U.S.C. §621 *et seq*; and *Ala. Code* §25-1-20-

29.  The City of Auburn filed an Answer asserting various affirmative defenses including (1) that

the City of Auburn was not Lacey's employer, and (2) that the employment decision in question was

based on legitimate, non-discriminatory reasons.

*II.*
*SUMMARY OF UNDISPUTED FACTS*

**A.    THE PLAINTIFF**

The Plaintiff, Norman Lacey (hereinafter "Lacey") is 57 years old.  (See Exhibit "A"

---

[1] Plaintiff referred to this position as Distribution Systems Manger in his deposition but for purposes
of clarity, the job will be referred to throughout this brief, as Water Distribution Manager.

Deposition of Norman Lacey p. 7 at lines 4-6).  Lacey has a two year degree from Faulkner College in Water and Waste Water Management.  (Lacey Depo. p. 20 at lines 2-13).  He has a Grade 4 Water Operators Certificate, a Waste Water Treatment Certificate and a Master Plumber's license. (Lacey Depo. p. 21 at lines 13-21). Lacey worked numerous jobs in the water treatment field. (Lacey Depo. p. 35 at line 7 to p. 36 at line 5; p. 38 at lines 4-8; p. 39 at lines 10-11; p. 40 at lines 8-14; p. 56 at lines 17-19; p. 57 at lines 5-19).

Lacey worked for the Water Works Board of the City of Auburn ("the Water Board") from August 1999 until July 2006.  (Lacey Depo. p. 82 at line 21 to p. 83 at line 6; p. 92 at lines 3-5; p. 206 at lines 7-23).

B.    THE DEFENDANT

The City of Auburn ("the City") is a duly incorporated municipality within the State of Alabama.  (See Exhibit "B" Affidavit of Steve Reeves, Exhibit "1" at ¶3).[2]  The Water Board is a separate entity and is organized as a public corporation under the laws of Alabama.  (Reeves Aff. at ¶ 3; Exhibit 1 of Reeves Aff. at ¶¶ 1, 2).  The City provides management services to the Water Board pursuant to a management agreement, which is Exhibit 1 to Reeves' Affidavit.  (Id.)  The agreement states as follows:

<u>Statement of Agreement</u>

1.  The City does hereby agree to accept the management of the water system of the City of Auburn, including but not limited to, all financial, accounting, collection, purchasing and engineering functions necessary to administer and operate the water system of the City of Auburn on a day to day basis under the policy direction of the Board.

2.    The Board shall be responsible for making all policy decisions affecting the water system of the City of Auburn and the City shall have no authority or jurisdiction to make any such policy decisions.

---

[2] Undersigned numbered the paragraphs of this Exhibit for references purposes.

> 3.    All employees of the Board shall remain employees of the
> Board and be covered by the group medical insurance, life insurance
> and retirement plans of the Board, except that the employees of the
> Board shall be subject to the pay plan, personnel rules and
> regulations and job descriptions adopted by the City.  The Board shll
> retain its' authority to hire, discipline and discharge all employees of
> the Board.

The Water Board maintains all hazard and liability insurance and hold the City harmless for

actions taken in carrying out Water Board policy.  (Exhibit "1" of Reeves Aff. at ¶¶ 9, 11).

## C.    LACEY'S EMPLOYMENT WITH THE WATER BOARD

Lacey was hired as a Water Plant Operator for the Water Board in August 1999 at the age

of 51. (Lacey Depo. p. 82 at line 21 to p. 83 at line 6; p. 92 at lines 3-5; p. 93 at lines 13-17). Lacey

admits that the Water Board was his employer.  (Id.)  Lacey was not an employee of the City.  (Id.)

As a Water Plant Operator, Lacey's responsibilities were to produce water for the City,

operate the pumps and chemical feeders and make sure the process was working correctly.

(Lacey Depo. p. 93 at lines 18-22).  Lacey described a typical day in his position as follows:

> Well, I would go in and check the levels, the tank levels and I would
> turn on the remote, the gauges we have, decide how many pumps
> to run, how much chemicals to feed, look at the filters to see which
> filters needed to be back-washed, make sure all the chemical tanks
> were full - - that's basically it.  Check it every hour as we went along
> during the day and make whatever adjustments were necessary to
> increase or decrease the flow.

(Lacey Depo. p. 97 at lines 6-19).

Rick McCarty was Lacey's supervisor.  (Lacey Depo. p. 97 at lines 20-22).  As plant

operator, Lacey did not supervise anyone and rarely had contact with the public.  (Lacey Depo. p.

97 at line 23 to p. 98 at line 4).  Lacey would do some paperwork for his shift, but the individual with

the last shift would complete the paperwork and give it to McCarty.  (Lacey Depo. p. 98 at lines 10-

20).  Lacey had no budgeting responsibilities or scheduling responsibilities and he had no authority

to discipline employees.  (Lacey Depo. p. 91 at lines 8-20; p. 93 at lines 4-10; p. 99 at lines 6-15).

-3-

Lacey applied for and was awarded the position of Chief Operator in December 2005. (Lacey Depo. p. 101 at lines 8-22). He was 57 years old when he was promoted to the Chief Operator position. (Lacey Depo. p. 106 at lines 17-19). Lacey was interviewed by the same three individuals who hired him; Rick [McCarty], Tony [Segrist] and Eric [Carson]. (Lacey Depo. p. 102 at lines 11-13). With the promotion, Lacey's duties increased to distribution, system sampling and the raw water plumbing station. (Lacey Depo. p. 104 at lines 9-19). Lacey's principal place of business was still the water plant and he traveled to other places when necessary. (Lacey Depo. p. 105 at lines 2-6). Lacey was 57 years old when he was promoted to the Chief Operator position. (Lacey Depo. p. 106 at lines 17-19). Lacey had no supervisory responsibilities in this position. (Lacey Depo. p. 106 at lines 20-22). Lacey's only administrative duties were to file reports and he had no budgeting or scheduling responsibilities as Chief Operator. (Lacey Depo. p. 107 at lines 13-21). As Chief Operator, Lacey handled complaints and water sampling in the community as did individuals from Segrist's office and McCarty. (Lacey Depo. p. 106 at line 23 to p. 107 at line 8; p. 108 at line 20 to p. 110 at line 10). Lacey dealt with a "handful" of these type of complaints during his tenure as Chief Operator. (Lacey Depo. p. 111 at lines 15-20).

### D. THE PROMOTION CLAIM - WATER DISTRIBUTION MANAGER

Scott Cummings was the Director of the Water Resource Management Department for the City of Auburn from June 2005 until September 2007. (See "Exhibit C" Affidavit of Scott Cummings at ¶2). As previously stated, the City had a management agreement with the Water Board. (Cummings Aff. at ¶2; see also Reeves Aff. at ¶ 3; Exhibit "1" to Reeves Aff.). Through the management agreement, Cummings oversaw water treatment and distribution. (Id.)

During Cummings' tenure as Director, a vacancy for the position of Water Distribution Manager was posted. (Cummings Aff. at ¶ 3). Applications and résumés were received for the position and Cummings, along with some of the members of the interview committee, selected the

top three candidates to be interviewed.  (Cummings Aff. at ¶3).

The interview committee consisted of a cross section of individuals who would be working with the person that was awarded the job of Water Distribution Manager.  (Cummings Aff. at ¶4). As acknowledged by Lacey, the interview committee was Eric Carson, Mikel Thompson, Charles Howard, Jill Holland, Kathy Bullard, and Derek Godfrey.  (Cummings Aff. at ¶4).  Forty-two year old Eric Carson, is the Assistant Director of the Water Resource Management Department.  (See Exhibit "D" Affidavit of Eric Carson at ¶¶ 1, 2).  Twenty-nine year old Mikel Thompson , is the Sewer Division Manager for the City.  (See Exhibit "E" Affidavit of Mikel Thompson at ¶¶ 1, 2).  Fifty-six year old Charles Howard, is a Heavy Equipment Operator for the Water Board.  (See Exhibit "F" Affidavit of Charles Howard at ¶¶ 1, 2).  Forty-three year old Jill Holland, is the Water Revenue Office Manager for the Water Board.  (See Exhibit "G" Affidavit of Jill Holland  at ¶¶ 1, 2).  Sixty year old Kathy Bullard, is the Utility Database Coordinator for the Board.  (See Exhibit "H" Affidavit of Kathy Bullard at ¶¶ 1, 2).  Thirty-nine year old Derek Godfrey, is the Water Coordinator for the Water Board.  (See Exhibit "I" Affidavit of Derek Godfrey at ¶¶ 1, 2).

Lacey learned about the vacancy for the Water Distribution Manager position when he came to work one morning and heard that Segrist[3] was resigning.  (Lacey Depo. p. 112 at lines 4-9). Lacey did not know what Segrist's day-to-day activities were because Segrist's office was located in a different place and he only visited the water plant where Segrist worked four or five times during Lacey's six year employment there.  (Lacey Depo. p. 117 at line 12 to p. 118 at line 11). McCarty continued to handle the water plant part of operations.  (Lacey Depo. p. 118 at lines 13-18).  To Lacey's understanding that would have left the Water Distribution Manager responsible for the day-to-day operations and maintenance of the Distribution System, including water line repairs, extensions, meter readings and whatever other maintenance, cleaning lines or fire hydrants

_____

[3] Tony Segrist, one of the individuals who initially interviewed Lacey and interviewed Lacey for the Chief Operator position, was leaving the Water Distribution Manager position.

that needed to be done.  (Lacey Depo. p. 118 at line 19 to p. 119 at line 5).

Lacey had been out for surgery prior to the interview for the Distribution System Manager and felt like he was not 100% on the day he returned and was interviewed.  (Lacey Depo. p. 126 at line 23 to p. 128 at line 5).  Regardless, Lacey did not ask anybody to reschedule the interview.  (Lacey Depo. p. 128 at lines 6-8).  Lacey states that there were six or seven people on the interview committee.  (Lacey Depo. p. 130 at lines 8-10).  At the time Lacey knew Cummings, Carson and Holland.  (Lacey Depo. p. 130 at line 8 to p. 132 at line 6).  The interview lasted approximately twenty minutes.  (Lacey Depo. p. 132 at lines 21-23).

The application submitted for the position of Water Distribution Manager did not reflect anyone's age and at no time during the course of the interview, nor the discussion that followed the interviews, was the age of the applicants discussed.  (Cummings Aff. at ¶5; see also Howard Aff. at ¶ 5; Carson Aff. at ¶ 5; Godfrey Aff. at ¶ 5; Bullard Aff. at ¶ 5; Holland Aff. at ¶ 5; Thompson Aff. at ¶ 5).  All the applicants were asked the same question.  (Id.)  After each interview, the applicants were discussed, but no employment decision was made until the completion of the interview process.  (Id.)

After each interview ended, the interviewers discussed the applicant, each agreed that Kyle Hildreth was the top candidate based on the qualifications they were looking for and that he gave the best interview.  (Cummings Aff. at ¶6; see also Howard Aff. at ¶ 4; Carson Aff. at ¶ 4; Godfrey Aff. at ¶ 4; Bullard Aff. at ¶ 4; Holland Aff. at ¶ 4; Thompson Aff. at ¶ 4).  Hildreth was 42 years old when he was hired.  (See Exhibit "J" Hildreth Payroll Information).  However, again, Hildreth's application did not reflect his age.  (See Exhibit "K" Hildreth Application for Water Distribution Manager).

Cummings stated:

> Compared to the other two candidates, his qualifications exceeded theirs in cruicial areas of concern such as supervisory experience, customer relations, staff management and operations for clients'

-6-

immediate needs and experience dealing with local contractors. While Mr. Lacey has some supervisory and management experience recorded on his application, this experience and background was not comparable to requirements of the Water Distribution Manager of the Board in terms of customer demands and system size. Also, the two jobs that Mr. Lacey held immediately prior to the promotion in question, Water Plant Operator and Chief Operator, were not in any way similar to what the Water Distribution Manager job entailed.

(Cummings Aff. at ¶7).  Cummings further stated:

While Kyle Hildreth did not have experience in water distribution, this was not a concern for us because he had many desirable and transferable skills that he had acquired as the manager of a concrete batch plant in Auburn.  It is my understanding that in that position, Mr. Hildreth had extensive supervisory responsibilities, scheduling responsibilities and intense project work.  It was apparent he could handle a stressful job.  The committee simply felt like these qualifications exceeded that of the other two candidates.

(Cummings Aff. at ¶8).  Cummings also stated as follows:

Additionally, Mr. Hildreth provided a very impressive interview. When answering the questions, he provided responses that were much more in line with what we were looking for than Mr. Lacey or the other candidate.  In fact, Mr. Lacey responded poorly to basic questions about the job he was seeking. He admitted in the interview that he had not read the job description. When asked about this, he said that he understood what the Water Distribution Manager did in the job only to later admit that the water plant (where he worked) was fairly isolated from the other employees and that he, in fact, did not know what the Water Distribution Manager did on a day to day basis.  During the course of the interview, Mr. Lacey also admitted that he was weak on paperwork and documentation, which was a concern because of the importance of documentation for the Water Distribution Manager.  Mr. Lacey also failed to give a good response to the questions about planning the staff work load for the week. (Interview notes for Mr. Lacey are attached hereto as Exhibit "1").

(Cummings Aff. at ¶9).  Cummings also spoke to Lacey's supervisor in an attempt to gather information about Lacey's job experience because it did not seem to Cummings that Lacey's past job experience was in line with the information or attitude that was revealed by Lacey during the interview process.  (Cummings Aff. at ¶10).  Speaking to Lacey's supervisor did not provide any further assistance about Lacey's candidacy for the job.  (Id.)

-7-

Cummings' interview notes revealed those and other concerns:

> *"has not read job description"*
>
> *"knew what Tony [Segrist] did" "Later stated he did not know how we are structured or how we operate"*
>
> *"weakness - paperwork/documentation"*
>
> *"does not appear to have experience dealing w/public, scheduling resources, and managing budget"*
>
> *"left all the interview team w/uneasy feeling that he could not handle the job"*
>
> *"failed to demonstrate any initiative or motivation for the job"*
>
> *"never talked to me or supervisor about job"*
>
> *"talked w/current supervisor about my issues and he could not offer any reason to think otherwise"*

(Exhibit "1" to Cummings Aff.).

Lacey admits that he told the interview committee that he had not read the revised job description prior to the interview. (Lacey Depo. p. 134 at lines 5-15). Lacey admits that he told the interview committee that he hated doing paperwork and assumed that when you dislike doing something, you do not do that aspect of your job as well. (Lacey Depo. p. 136 at lines 2-16). Lacey says he was asked questions about contractors but did not even realize the distinction between contractors working for the Water Board and contractors building houses. (Lacey Depo. p. 136 at line 17 to p. 137 at line 9).

Lacey's testimony reveals a certain tone or attitude that is consistent with Cummings' interview observations:

Q:     What kind of questions were you ask about contractors?

A:     I don't remember specifically. I think they were saying that they had a lot of problems with contractors in the area - - I don't know what that means.

Q:     Did you ask them which kind of contractor they were talking about?

-8-

> A:     I didn't ask, because as long as I wasn't asked a question
> about what they were doing specifically - - I didn't ask.

(Lacey Depo. p. 137 lines 10-20).

Lacey believes he was asked about his supervisory experience during the interview but does not recall what he said in response to the questions. (Lacey Depo. p. 190 at lines 3-18). Lacey was asked about his experience in handling customer relations during the interview:

> Well, I think there was some comment about Jill being a very tough person to deal with, and I remember telling them that in Jill's position she has to be a tough person to deal with, because that is one of the things that I used to tell my clerks was you never blink with a customer. You are sympathetic, you listen to what they have to say, but you never say wait a minute did I make a mistake, you know you don't do that. You check - - if you think you made a mistake you stop and you look, and then you go back, but you don't ever blink in front of a customer. Because if you do, you only prolong an argument that you don't have to have.

(Lacey Depo. p. 190 at line 19 to p. 191 at line 17).

Lacey also discussed any supervisory experience that he had with the interview committee. (Lacey Depo. p. 192 at lines 2-8).

There were two male interviewers who Lacey did not know. (Lacey Depo. p. 141 at lines 8-12). One of the interviewers asked Lacey a question about computer software and the other one did not ask any questions. (Lacey Depo. p. 141 at line 8 to p. 142 at line 1). According to Lacey, the individual who did not ask a question began shaking his head, gesturing "no" as Lacey walked into the interview. (Lacey Depo. p. 139 at lines 6-15; p. 141 at lines 5-20). When asked if Lacey had any idea why the individual shook his head, Lacey stated, "I assume that meant that he didn't like me, but that's an assumption." (Lacey Depo. p. 142 at lines 15-18). Nobody has ever given Lacey a reason why that happened. (Lacey Depo. p. 142 at lines 19-21). Lacey never talked to Cummings or McCarty about the alleged shaking of the head. (Lacey Depo. p. 142 at line 22 to p. 143 at line 1). Lacey said that he felt like he made a good representation of himself and made clear to the interview committee that he wanted the promotion. (Lacey Depo. p. 143 at lines 4-12).

Lacey said that there was nothing about his prior job as a Water Plant Operator with the Water Board that would have been involved with the new position, but that his Chief Operator position involved handling customer complaints and sampling to a degree, which was relevant to the new position.  (Lacey Depo. p. 144 at line 22 to p. 145 at line 9).

Lacey learned from one of the water plant operators, Martin Squires, that someone else had been hired for the position as Water Distribution Manager.  (Lacey Depo. p. 150 at lines 5-18).

### E.    Lacey's claim of Age Discrimination

Lacey's sole claim in this case is that he did not receive the position of Water Distribution Manager because of his age.  (Lacey Depo. p. 154 at lines 15-21).  The alleged basis for that claim is as follows:

### 1.    Alleged Comments By Supervisor and Cummings

Lacey claims that comments by Cummings and McCarty are evidence of age discrimination.  (Lacey Depo. p. 197 at line 19 to p. 198 at line 4).  Lacey said that there were no other comments made by anyone else that supported his claim of age discrimination.  (Lacey Depo. p. 199 at lines 9-15).

Lacey asked McCarty about the hire and Lacey claims McCarty said that the man was younger, there was going to be a stiff learning curve on the new job and they felt he would be a better fit.  (Lacey Depo. p. 151 at line 20 to p. 162 at line 12).  Lacey did not know how McCarty knew the individual hired was a younger man.  (Lacey Depo. p. 152 at lines 13-21).  McCarty was not on the interview committee.  (Lacey Depo. p. 153 at lines 4-6; see also Cummings Aff. at ¶4). Lacey knows of no input that McCarty had in who received the position.  (Lacey Depo. p. 153 at likes 7-9).  McCarty never said that the individual selected was hired because he was younger.  (Lacey Depo. p. 153 at lines 10-16; p. 155 at lines 2-8).  McCarty allegedly told Lacey that Cummings thought Lacey was a better fit in the Chief Operator position he was in.  (Lacey Depo.

p. 153 at lines 17-18).  Lacey was asked why at that point he believed he had been discriminated against and he stated:

> I assumed at that point that if they hired a younger man with no experience instead of hiring an experienced older man they were being discriminatory, yes, sir.

(Lacey Depo. p. 154 at lines 15-21).   However, Lacey does not know the age of the man they hired.  (Lacey Depo. p. 155 at lines 15-17).

Lacey then had a meeting with Cummings.  (Lacey Depo. p. 155 at line 20 to p. 156 at line 16).   During the conversation with Cummings, Lacey claims that Cummings said the person awarded the position had more experience dealing with the public and that they wanted to hire someone that would be there for a long time.  (Lacey Depo. p. 157 at lines 12-20).  Lacey then said that he actually recalled Cummings asking how long it was going to be before Lacey retired. (Lacey Depo. p. 160 at lines 11-21).  Cummings denies these statements.  (Cummings Aff. at ¶11). Lacey says that there were no other discriminatory comments by Cummings.  (Lacey Depo. p. 199 at lines 9-15).

After the meeting with Cummings, Lacey said that Cummings visited the plant on several occasions to talk to Lacey and assure him that he should be happy in the job he was in.  (Lacey Depo. p. 163 at line 2 to p. 164 at line 1).  Cummings never said anything else to Lacey about how long he would be in the job, his age or retirement.  (Lacey Depo. p. 164 at line 6 to p. 165 at line 23).  Lacey believes Cummings instigated the discrimination and is entirely responsible for it. (Lacey Depo. p. 188 at lines 4-8).

### 2.    Comparative Qualifications and Any Other Evidence

Lacey further bases his claim on the allegation that Hildreth is less qualified than him. Lacey makes this claim on the fact that Hildreth had no prior water experience.  (Lacey Depo. p. 186 at line 7 to p. 187 at line 9).

-11-

When asked what evidence Lacey had regarding not receiving the promotion in question because of his age, he testified as follows:

> I think the evidence is in my background, I think it speaks for itself. I was eminently qualified for the job and I don't think I was actually given a chance to be even considered for the position ...
>
> As I said when I went in there, there was one man shaking his head "no" - - apparently job experience doesn't count for anything. The fact that I had a very positive work record with Auburn didn't count for anything. I was under the impression that there was veteran's preference given to city employees - - Scott tells me he never heard of that. So I felt like I was discriminated against, yes, sir. And I think it's all there in the records in my résumé.

(Lacey Depo. p. 195 at line 22 to p. 196 at line 20).

## F.    No Evidence of Age Discrimination

Cummings explained that he followed the Equal Employment Opportunity policies of the Water Board and had never discriminated against a candidate because of their age or for any other reason. (Cummings Aff. at ¶11). Cummings stated: "I never discussed Mr. Lacey's age with anyone." (Cummings Aff. at ¶11). All the other interviewers confirmed that Hildreth was the top choice for the job based on his background and the criteria they were looking for. (Howard Aff. at ¶4; Godfrey Aff. at ¶4; Carson Aff. at ¶4; Holland Aff. at ¶4; Bullard Aff. at ¶4; Thompson Aff. at ¶4). They all confirmed that Hildreth gave the best interview. (Id.) All the interviewers confirmed that they never had discussions with Cummings about anyone's age or about whether they were looking for someone who was going to be in the job for a long time. (Howard Aff. at ¶5; Godfrey Aff. at ¶5; Carson Aff. at ¶5; Holland Aff. at ¶5; Bullard Aff. at ¶5; Thompson Aff. at ¶5). At no time was age a part of the discussions or decision-making process for the job of Water Distribution Manager. (Howard Aff. at ¶6; Godfrey Aff. at ¶6; Carson Aff. at ¶6; Holland Aff. at ¶6; Board Aff. at ¶6; Thompson Aff. at ¶6).

G.     **After the Promotion**

Lacey says that, at one point, he was told that the new hire had upset the water lines in a certain part of town and was asked to become involved in resolving a complaint. (Lacey Depo. p. 170 at line 13 to p. 172 at line 18). Later that day, Kyle Hildreth, the new Water Distribution Manager, called Lacey and asked him to go out and take the samples. (Lacey Depo. p. 172 at lines 19-22). Lacey feels that the problem was Hildreth's fault because he is the manager of the Distribution System. (Lacey Depo. p. 173 at lines 1-5). Therefore, instead of following instructions, Lacey wanted to talk to Cummings before doing what Hildreth asked because he did not feel it was his job. (Lacey Depo. p. 173 at line 6 to p. 174 at line 1). Lacey talked to Cummings and said it was not his (Lacey's) responsibility. (Lacey Depo. p. 174 at lines 20-23). Lacey did not do what was requested of him. (Lacey Depo. p. 175 at line 6 to p. 176 at line 2).

After the incident where Hildreth requested Lacey to take samples, Lacey says there was a hold up on his raise and negative comments on his evaluation. (Lacey Depo. p. 194 at line 17 to p. 195 at line 1). Regardless, Lacey got the raise. (Lacey Depo. p. 195 at lines 11-13). Lacey submitted a letter of resignation to the Water Board after he accepted a position with his present employer. (Lacey Depo. p. 195 at lines 17-21)[4].

Lacey filed a Complaint with the EEOC while he was still employed with the Water Board. (Lacey Depo. p. 165 at lines 1-5).

### III.
### ARGUMENT AND CONCLUSIONS OF LAW

A.     STANDARDS GOVERNING SUMMARY JUDGMENT

The moving party bears the initial burden of informing the court of the basis for its motion

---

[4] There is an issue as to whether Lacey resigned or whether the Water Board considered him terminated for no showing to work for more days than allowed by personnel policies. However, it is undisputed and agreed by the parties that any issue regarding his termination/resignation, is not a claim or the basis of any cause of action in this lawsuit. (Lacey Depo. p. 224 at line 10 to p. 226 at line 18).

and of identifying those materials that demonstrate the absence of a genuine issue of material fact. *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)); *Fed.R.Civ.P.* Rule 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* supra, 477 U.S. at 323. The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which [he] will bear the burden of proof at trial." *Celotex*, supra, 477 U.S. at 322; see also *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, supra,477 U.S. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586,106 S.Ct. 1348, 1356, 89 L.Ed.2d. 538 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court in *Fitzpatrick* held for issues on which the non-movant would bear the

burden of proof at trial as follows:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. (citation omitted).

*Fitzpatrick*, supra, 2 F.3d at 1116.

### B.     THE CITY OF AUBURN IS NOT LACEY'S EMPLOYER

It is undisputed that Lacey was employed by the Board, not the City of Auburn. (Lacey Depo. p. 93 at lines 13-17). Lacey admits that he was an employee of the Board. (Id.) The Water Board is a separate legal entity that was incorporated under the laws of the State of Alabama. (Reeves Aff. at ¶3). Steve Reeves, the Director of Human Resources, confirms this relationship and explains that the City provides management services to the Water Board pursuant to a management agreement. (Reeves Aff. at ¶2; Exhibit "1" of Reeves Aff.). The Water Board made it very clear in its response to the EEOC that it was the employer of Lacey. Lacey has never indicated that he believed he was an employee of the City.

In the case of *Walker v. City of Elba*, 874 F.Supp. 361 (M.D. 1994), the court held that the City of Elba was entitled to judgment as matter of law because the plaintiff, a Water & Electric Board employee, was not an agent or employee of the city. Id. at 364. In that case, the court noted that the City of Elba was not involved in hiring the plaintiff, handling plaintiff's work schedule

or endorsing pay check.  Id.  The court further noted that the City of Elba did not have control or authority to operate the Board and was not liable for misfeasance for the Board's activities.  Id.  The *Walker* court further noted that the Board was a duly incorporated legal entity existing on its own behalf.  Id.  As in the *Walker* case, the City does not control or operate the Water Board.  Rather, the City simply provides services to the Water Board pursuant the management agreement.  As is evidenced by the Management Agreement, the Water Board retains its authority to hire, discipline and discharge all employees of the Board.  (Exhibit "1" at ¶7 of Reeves Aff).  There is no case authority to support the notion that because the Water Board chooses to contract with the City to provide these services, that the City should be considered Lacey's employer.  The Management Agreement makes clear that the Board shall maintain all hazard and liability insurance, require financial and expense reports from the City and hold the City harmless for any actions taken by City employees in carrying out the policy directives of the Water Board.  (Exhibit "1" at ¶¶9, 10, 11 of Reeves Aff.).  In fact, the Management Agreement specifically states that the City will not appoint members of the Water Board that are part of City Council.  (Exhibit "1" at ¶13 of Reeves Aff.).  Importantly, even though the City, pursuant to the agreement ,handles the management of the day-to-day operations of the Water Board, such is done at the policy direction of the Water Board.  The agreement states: "the Board shall be responsible for making all policy decisions affecting the water system of the City of Auburn and the City shall have no authority or jurisdiction to make any such policy decisions."  (Exhibit "1" at ¶¶5, 6 of Reeves Aff.).  Most critically, the agreement states as follows:

> "All employees of the Board shall remain employees of the Board and be covered by the group medical insurance, life insurance and retirement plan for the Board, except that the employees of the Board shall be subject to the pay plan, personnel rules and regulations and job descriptions adopted by the City.

(Exhibit "1" at ¶7 of Reeves Aff.).  As such, the City is due to summary judgment as a matter of law on both Lacey's claims because it is undisputed that the City was not Lacey's employer.  See Ryals v. Mobile Cty Sheriff's Department, 39 F.Supp. 25 (S.D. Ala. 1993); Oaks v. City of Fairhope, 515 F.Supp. 1004 (S.D. Ala. 1981) (holding no joint employer relationship between library and city because state law rested full power and authority in library board and city council had no control over practices and policies of librarian); Lyes v. City of Rivera Beach, FL, 166 F.3d 1332 (11th Cir. 1999) (holding that city and redevelopment agency were not single employer for Title VII purposes in part because state law established that agency was separate and distinct body).

> **C.    AGE DISCRIMINATION EMPLOYMENT ACT (29 U.S.C. §621 ET.SEQ)**

Lacey alleges that he did not receive a promotion to the job of Water Distribution Manager because of his age.  According to the United States Supreme Court:

> When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).  That is, the plaintiff's age must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome."

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000).

> In order to survive a motion for summary judgment, the plaintiff must first establish a prima facie case of age discrimination.  This may be accomplished by presenting direct evidence of discriminatory intent, such as age-biased statements made by the decision maker, see Earley v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990); by presenting circumstantial evidence which complies with the test set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct.1817, 36 L.Ed.2d 668 (1973); or by presenting a statistical pattern of discrimination, Earley, 907 F.2d at 1081.

Zaben v. Air Products & Chem., Inc., 129 F.3d 1453, 1457 (11th Cir. 1997).

In the instant case, there is no statistical evidence of a pattern of age discrimination nor is

there direct evidence of age discrimination. Lacey must meet the burdens of maintaining a circumstantial evidence case.

To establish a *prima facie* case of age discrimination in the absence of direct evidence, Lacey must proceed under the circumstantial evidence framework set forth in *McDonnell-Douglas*. As such, "[t]he same order and allocation of proof in cases under Title VII govern suits under the ADEA." *Dooley v. Autonation USA Corp.*, 218 F.Supp.2d 1270, 1277 (N.D. Ala. 2002)(citing *Bonham v. Regions Mortgage, Inc.*, 129 F.Supp.2d 1315, 1321 (M.D. Ala. 2001))(See also *Archambault,* supra, 786 F.2d at 1512).

Lacey must show (1) that he is a member of a protected class, (2) that he suffered an adverse action, (3) that he was qualified for the position, and (4) that he lost the position to a person outside his protected class. *Archanbault v. United Computing Sys. Inc.,* 786 F.2d 1507, 1512 (11th Cir. 1986). Further, Lacey must point to a sufficient age difference between himself and the person selected such that a fact finder could reasonably conclude that the selection was based on age. *Waldemar v. American Cancer Society*, 1996 WL 376381 *11 (N.D. Ga.) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3rd Cir. 1995), cert. denied, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed. 2d 854 (1995). Inasmuch as five of the seven interviewers were over the age of 40 and members of the protected class themselves and insomuch that the successful applicant was 42, and in the protected class himself, Lacey cannot establish an age discrimination claim based on the job in question. Summary judgment is therefore due to be granted as a matter of law.[5]

Regardless, even if Lacey could establish a *prima facie* case, summary judgment is still due to be granted. Under the *McDonnell-Douglas* framework, assuming a *prima facie* case is

---

[5]  If the court disagrees, for purposes of summary judgment only, the City concedes that Lacey otherwise meets the elements of a *prima facie* case.

established, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons for the alleged adverse employment action. *McDonnell-Douglas*, supra, 411 U.S. at 802-804. When legitimate, non-discriminatory reasons are proffered, the burden then shifts back to Lacey to establish that those reasons are pretextual. Id. Lacey has the ultimate burden of proving the reason to be pretextual. *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir. 1997). If Lacey fails to produce evidence sufficient to permit a reasonable fact finder to disbelieve the proffered, non-discriminatory reasons, summary judgment should be granted. *Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223, 1230 (11th Cir. 2002). It should be noted that the defendant's burden is merely one of production; it "need not persuade the Court that it was actually motivated by the proffered reasons." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

In the present case, the City meets its burden of establishing a legitimate, non-discriminatory reason through the testimony of Cummings, Thompson, Holland, Bullard, Howard, Godfrey and Carson. As is set out herein, the interviewers believed that Hildreth's background and experience made him more qualified for the position. (Carson Aff. at ¶4; Howard Aff. at ¶4; Godfrey Aff. at ¶4; Thompson Aff. at ¶4; Bullard Aff. at ¶4; and Holland Aff. at ¶4). They all agreed Hildreth gave the best interview. (Id). Cummings further believed that Lacey did not give a good interview. Cummings explained that Lacey had not read the job description, admitted to being weak with paperwork and documentation and gave a poor answer to a question regarding a staff work load. (Cummings Aff. at ¶9). He simply gave a poor interview. See *Chapman v. AI Transport,* 229 F.3d 1012, 1033 (11th Cir. 2000) (holding that a poor interview is a legitimate, non-discriminatory reason for failure to hire); see also *Bass v. Bd. of County Com'rs,* 256 F.3d 1095, 1105-06 (11th Cir. 2001); *Roper v. Foley*, 177 Fed.Appx. 40, 49 (11th Cir. 2006). As it relates to explaining the employment decision, the City adopts and incorporates herein ¶¶7, 8 and 9 of Cummings Affidavit as if set out

-19-

here in full as is reflected on page 6 and 7 of this Memorandum Brief.

It is important to note that Cummings even spoke to Lacey's supervisor in an attempt to gather information about Lacey's job experience because it did not seem to Cummings that his past job experience was in line with the information or attitude that was revealed by Lacey during the interview process. (Cummings Aff. at ¶10). However, speaking to Lacey's supervisor did not provide any further assistance about Lacey's candidacy for the job. Id. Even a sampling of Cummings interview notes confirmed these problems during the course of the interview. (See Exhibit "1" to Cummings Aff.). What is more important is that Lacey does not deny any of the concerns that have been explained by Cummings and reflected in his interview notes. Lacey admits that he told the interview committee that he had not read the revised job description prior to the interview. (Lacey Depo. p. 134 at lines 5-15). Lacey admits that he told the interview committee that he hated doing paperwork and therefore was not good at it. (Lacey Depo. p. 136 at lines 2-16). Lacey demonstrated confusion and a poor attitude about the issue of contractors which was reflected as something that was important to the interview committee. (Lacey Depo. p. 136 at line 17 to p. 137 at line 20). All of the reasons discussed herein played a part in the employment decision in question; not promoting Lacey to Water Distribution Manager.

Because Defendant has met its burden, Lacey must provide evidence of pretext to create a genuine issue of fact for a jury. Lacey cannot meet that burden here. Lacey's opinion that he is more experienced and therefore should have gotten the position is irrelevant. See *Gamble v. Aramark Uniform Services,* 132 Fed.Appx. 263, 266 (11th Cir. 2005) (holding that plaintiff's assertions about the "successful" candidates and the alleged inferior qualifications are insufficient to demonstrate pretext because the plaintiff may not substitute his opinion - that job experience within a company renders an applicant more qualified  for that of the employer and citing *Chapman, supra,* 229 F.3d at 1030-31) (rejecting plaintiff's claims that because he had certain qualifications that successful candidate lacked, employer's rationale, based on other criteria, was pretextual); see

also *Combs,* supra, 106 F.3d at 1543.  Even if Lacey's water experience had proven to be a

relevant or even important consideration, there is not such a disparity in qualifications that "no

reasonable person, in the exercise of impartial judgment, could have chosen [the successful

candidate] over [the plaintiff] for the [subject] job." *Hithon v. Tyson Foods, Inc.,* 144 Fed.Appx. 795,

800 (11th Cir. 2005).  Cummings explained that Hildreth's lack of water experience did not matter

because of the extent of Hildreth's other skills and experience. (Cummings Aff. at ¶8).  Again,

Lacey's own unsubstantiated opinions in this regard are irrelevant to the Court's analysis. *Barrow*

*v. Georgia Pacific Corporation,* 144 Fed.Appx. 54, 58 (11th Cir. 2005) (holding that plaintiff's claim

failed when he presented only his unsubstantiated opinion that he was qualified for the position in

question).  Here, Lacey has stated that he was more qualified because of his water systems

experience and that the individual who received the job had no water experience.  However,

Cummings has explained that the successful applicant's experience in supervising and

administration were the more critical qualities considered in making the hiring decision.

Regardless, in a failure to promote case, a plaintiff cannot prove pretext by simply showing that he

was better qualified than the individual who received the position.  See *Denney v. City of Albany,*

247 F.3d 1172, 1187 (11th Cir. 2001) (quoting *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-54

(11th Cir. 2000)); see also *Walker v. Prudential Property and Casualty Insurance Company,* 286

F.3d 1270, 1277 (11th Cir. 2002).  (Cummings Aff. at ¶¶7, 8, 9).  Cummings explained that Hildreth

had extensive supervisory responsibilities, scheduling responsibilities and intense project work.

(Cummings Aff. at ¶8).  Cummings surmised that Hildreth could handle a stressful job and the

committee simply felt like these qualifications exceeded Lacey and the other candidate.

(Cummings Aff. at ¶8).  (Howard Aff. at ¶4; Carson Aff. at ¶4; Thompson Aff. at ¶4; Bullard Aff. at

¶4; Godfrey Aff. at ¶4; Holland Aff. at ¶4).  The Eleventh Circuit has held that it will not second

guess an employer's "decision to emphasize qualifications over length of service."  *Cofield v.*

*Goldkist, Inc.*, 267 F.3d 1264, 1269 (11th Cir. 2001) (citing *Chapman*, supra, 229 F.3d at 1030);

-21-

see also *Norrell v. Waste Away Group, Inc.*, 246 F.Supp.2d 1213, 1223 n. 12 (M.D. Ala. 2003). Lacey "may not establish that [the Water Board's] proffered reason is pretextual merely by questioning the wisdom of [the Water Board's] reason as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (quoting *Combs*, supra, 106 F.3d at 1543) (internal quotation omitted). Despite Lacey's opinion that he was better qualified than the candidates selected, he cannot meet the *Lee* standard of disparity. As noted in *Denney*, supra, 247 F.3d at 1188, "[the courts] do not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." (citing *Alexander v. Fulton County,* 207 F.3d 1303, 1339 (11th Cir. 2000).

To the extent that Lacey would argue that the Defendant's explanation for the employment decision was subjective, said argument is irrelevant. The Eleventh Circuit has treated such subjective considerations as follows:

> A subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas* burden analysis. Indeed, subjective evaluations of a job candidate are often critical to the decision-making process, and if anything, are becoming more so in our increasingly service-oriented economy...Personal qualities...factor heavily into employment decisions concerning supervisory or professional positions. Traits such as "common sense, good judgment, originality, ambition, loyalty, and tact" often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position...To phrase it differently, subjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons.

*Denney*, supra, 247 F.3d at 1185-86, (quoting *Chapman,* supra, 229 F.3d at 1033-34 (internal citations omitted)).

Cummings explains that, after Lacey's interview, he attempted to gather more information about Lacey's job experience because it did not seem in line with the information or attitude exhibited in Lacey's interview. (Cummings Aff. at ¶10). Cummings did not receive any information

-22-

from Lacey's supervisor that shed better light on Lacey as a candidate for the job.  Id.  <u>See</u> *Cooper v. Southern Company*, 390 F.3d 695 (11th Cir. 2004) (holding that average performance and not being a consistently strong performer were legitimate, non-discriminatory reasons for an employment decision).  Lacey's opinion that the interview committee was simply wrong about his performance of past job experience is not evidence of pretext.  <u>See</u> *Moore v. Sears,* 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982) (<u>noting</u> "[i]t is well settled in employment discrimination cases ... that for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance" and <u>citing</u> *Burdine*, 450 U.S. 248, (other citations omitted).  The fact that Hildreth had no experience with the Water Board, but had extensive supervisory experience with another company, which was important to the interview committee, is also not evidence of pretext.  The Eleventh Circuit has stated:

> A reasonable employer could prefer a person, like [successful candidate], who had served in a supervisory position with a competitor, rather than the individuals in the company with some experience serving in the available position.

*Gamble,* <u>supra</u>, 132 Fed.Appx. at 266 (<u>citing</u> *Chapman,* <u>supra</u>, 229 F.3d at 1030-31 and *Combs, supra,* 106 F.3d at 1543).

Lacey's only other argument to establish age discrimination outside of comparative qualifications, are the comments alleged to be made by Cummings after the employment decision was made.  However, these comments do not constitute evidence of pretext because it is undisputed that Cummings did not discuss age with any of the other interviewers and all six of them chose Hildreth as the top candidate.  (Bullard Aff. at ¶4; Carson Aff. at ¶4; Godfrey Aff. at ¶4; Holland Aff. at ¶4; Howard Aff. at ¶4 and Thompson Aff. at ¶4).  As such, Cummings' comments, assuming they were made, are in no way an indication that Lacey was not chosen because of his age.  There is no evidence it was ever even considered.

Because Lacey cannot present evidence of pretext, summary judgment is due to be granted

as a matter of law.  However, out of an abundance of caution and to the extent that Lacey intends to argue that Cummings' alleged statements are direct evidence of discrimination, the City of Auburn further states as follows.

As previously stated, Lacey claims that  Cummings said that they wanted to put someone in the job who would be there a long time and that Cummings asked him about his retirement. (Lacey Depo. p. 155 at line 20 to p. 156 at line 16; p. 157 at lines 12-20; p. 160 at lines 11-21). This conversation occurred <u>after</u> Hildreth was awarded the job.  (Id).  Lacey alleges that these comments are evidence of age discrimination.  However, these comments cannot be considered direct evidence of age discrimination based on pertinent case authority.

In order to show intentional discrimination through direct evidence, Lacey must present evidence that "is sufficient to prove discrimination without inference or presumption.  Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." *Clark v. Coats & Clark,* 990 F.2d 1217, 1223 (11th Cir. 1993).  Direct evidence is described as evidence which reveals discriminatory intent without the need for inference or presumption.  *Standard v. A.B.E.L.,* 161 F.3d 1318, 1330 (11th Cir. 1998) (<u>citing</u> *Carter v. City of Miami*, 870 F.2d 578, 580-81 (11th Cir. 1989)).  In *Shook v. St. Bede School*, 74 F.Supp.2d 1172, 1177-78 (M.D.Ala. 1999), when a parent asked why the principal was being terminated, the parent was told that the principal was "old" and "set in his ways."  The Court held that the statement was not direct evidence of discriminatory motive.  "The description of [the principal] as 'old and set in his ways' suggest little more than [the supervisor's] willingness to speak in cliches." <u>Id.</u>  In *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000), a sex discrimination case, the Court held that it was not direct evidence of discriminatory intent that the plaintiff may have been the first female principal in the county, that a board member repeatedly referred to the plaintiff as "Kay Baby", that no male principal had ever been fired, or that her evaluation was no worse than her male replacement.  Moreover, *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266-67 (11th Cir. 1999)

-24-

held that it was not direct evidence of race discrimination against the white male plaintiff when supervisor suggested that he had not been hired for position because of his race and gender, when supervisor told employee delivering personnel recommendation that he "wanted the women or minorities on the certificate to be reviewed again" or when same supervisor was asked during deposition whether plaintiff was not hired because he was white and male, responded "it was more than that".

Moreover, the alleged comments were made <u>after</u> the decisionmaking process which negates the possibility that Cummings' alleged statements constitute direct evidence. <u>See</u> *Jones v. BE&K Engineering Co.,*, 146 Fed.Appx 356 (11th Cir. 2005)(statements made *after* the plaintiff was discharged could not constitute direct evidence of age discrimination because the statements were made subsequent to the decisionmaking process). Regardless, the statements are not so blatant that they do not need interpretation, therefore under no circumstances could they be considered direct evidence. <u>See</u> *Templeton v. Bessemer Water Service*, 154 Fed.Appx. 759 (11th Cir. 2005)(holding that statements by decisionmaker to employee that [decisionmaker] was going to hire a younger person for a promotional position and saying that he did not think employee was coming back after heart surgery, were not direct evidence of age discrimination); *Schweers v. Best Buy, Inc.*, 132 Fed.Appx. 322 (11th Cir. 2005)(holding that plaintiff's superior calling plaintiff "old man" and "senior member of the management team" did not necessarily, or by implication, mean that plaintiff was fired because of his age). Comments about retirement or comments about wanting younger workers are also <u>not</u> direct evidence of age discrimination. <u>See</u> *Roberts v. Design & Mfg Services, Inc.*, 167 Fed.Appx. 82 (11th Cir. 2006)(holding that alleged statements by employer's president were subject to more than one interpretation and required inferential leaps that president terminated employee due to his age, and thus did not provide direct evidence of age discrimination where president said plaintiff was "getting too old for this stuff", plaintiff "needed to spend more time with his family and get back to playing golf" and president made inquiries about

when plaintiff would retire); *Minton v. American Bankers Ins. Group, Inc.*, 2003 WL 21303330 (11th Cir.)(holding that plaintiff's supervisor stating that he needed fresh new blood, that older employees should step aside so younger employees could also achieve measure of wealth, and asking when plaintiff intended to retire, did not constitute direct evidence of age discrimination when comments were made after plaintiff's).

Based on the foregoing precedential case authority, it cannot be established that the alleged comments by Cummings, which Cummings denies, constitute direct evidence.[6]  However, even if such evidence was considered direct, the City would still be due summary judgment if it established "that it would have made the same employment decision in the absence of discriminatory motivation."  *Wall v. Trust Co. of Ga.*, 946 F.2d 805, 809 (11th Cir. 1991) citing *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1988); *Wilson v. City of Aliceville*, 779 F.2d 631, 634 (11th Cir. 1986); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774-76 (11th Cir. 1982).

Cummings, along with all the other interviewers, chose Hildreth as the top candidate for the position instead of Lacey.  They have unequivocally stated that Hildreth had more relevant qualifications for the job and gave a better interview in response to the questions that the committee found pertinent for the job.  (Cummings Aff. at ¶¶6, 7; see also Bullard Aff. at ¶4-6; Carson Aff. at ¶4-6; Godfrey Aff. at ¶4-6; Holland Aff. at ¶4-6; Howard Aff. at ¶4-6 and Thompson Aff. at ¶4-6).  The evidence is undisputed that their were no discussions regarding age during the decisionmaking process.  In short, even if Cummings' alleged comments could be considered direct evidence, Lacey cannot overcome the fact that he would not have been given the job in question

---

[6]  Lacey testified about some alleged remarks from Rick McCarty.  These remarks could never establish direct evidence of discrimination because it is undisputed that Rick McCarty was not a decision-maker.  See *Standard,* supra, 161 F.3d at 1330 (citing *EEOC v. Alton Packaging Corporation*, 901 F.2d 920, 924 (11th Cir. 1990)).

regardless of the alleged consideration of his age.  Lacey cannot dispute the fact that each of the six other interviewers said Hildreth was their top choice and that Cummings never made a comment about any applicant's age or how long a person would be in the job.  (Howard Aff. at ¶¶5, 6; Godfrey Aff. at ¶¶5, 6; Thompson Aff. at ¶¶5, 6; Bullard Aff. at ¶¶5, 6; Carson Aff. at ¶¶5, 6; and Holland Aff. at ¶¶5, 6).  There is no question that Hildreth would have been awarded the job regardless of age.

To that end, the City adopts and incorporates, as if stated in full here, all factual and evidentiary discussions in the memorandum brief regarding the legitimate, non-discriminatory reasons for the subject employment decision and the discussion regarding lack of pretext evidence.

Based on the foregoing, Lacey's ADEA claim is due to be dismissed as a matter of law.

### D.    ALABAMA AGE DISCRIMINATION ACT OF 1997 (§25-1-20-29 ALA. CODE)

Lacey also alleges an age discrimination cause of action against the City of Auburn pursuant to state law. The Alabama Age Discrimination Act of 1997 provides that "[n]o employer ... shall discriminate in employment against a worker 40 years of age and over in hiring, job retention, compensation or other terms or conditions of employment." *Ala. Code* §25-1-21 (1975). Because the Alabama statute is similar in purpose to the federal statute, this claim is properly examined under the same framework as the Federal Age Discrimination In Employment Act. *Robinson v. Ala. Cent. Credit Union,* 964 So.2d 1225 (Ala. 2007).  Accordingly, for the reasons stated herein, Lacey's state claim for age discrimination is due to be dismissed as a matter of law.

### E.    PUNITIVE DAMAGES

Lacey cannot be awarded punitive damages against the City of Auburn on any state law or federal law claims.  See *Ala. Code* § 6-11-26 (1975); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

**IV.**

**CONCLUSION**

Based on the undisputed facts of this case and precedential case authority, summary judgment is due to be granted on all Lacey's claims against Defendant.  Under the undisputed facts, there is no genuine issue of material fact to be submitted to a jury.

**Wherefore premises having been considered**, Defendant requests this Court to grant summary judgment in its favor and dismiss all of Lacey's claims against it as a matter of law.

Respectfully submitted this 14th day of December 2007.

City of Auburn, Defendant

By: *Isl Randall Morgan*
Randall Morgan [MORG8350]
Attorney for Defendant City of Auburn

OF COUNSEL:
Hill, Hill, Carter, Franco,
  Cole & Black, P.C.
425 South Perry Street
Montgomery, Alabama 36104
334-834-7600
334-263-5969 - Fax

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 14th day of December, 2007, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following via email:

Roderick E. Cooks, Esq.
Winston Cooks, LLC
The Penick Building
319 17th Street North
Birmingham, Alabama 35203

*Isl Randall Morgan*
OF COUNSEL

-28-